# EXHIBIT H

# RESTRICTED TOKEN PURCHASE AGREEMENT

This Restricted Token Purchase Agreement (this "***Agreement***") is made and entered into as of September 8, 2022 (the "***Effective Date***") by and between SkyBridge Capital II, LLC (the "***Purchaser***"), a Delaware limited liability company, and Alameda TR Systems S.de R. L., a company, incorporated under the laws of the Republic of Panama, (the "***Seller***"). The Seller and Purchaser hereby agree as follows:

1. **SALE OF TOKENS.**

    **1.1.** **Purchase and Sale.** In exchange for payment by the Purchaser of the total purchase price ("***Total Purchase Price***") as set forth on the signature page hereto, Seller hereby agrees to sell to such Purchaser the aggregate number of "***SRM***" and "***FTT***" tokens (also referred to herein collectively as the "***Tokens***" or the "***Restricted Tokens***" as applicable) set forth on the signature page hereto ("***Number of Tokens Purchased***"), on the conditions and subject to the terms set forth hereunder.

    **1.2.** **Payment.** Purchaser covenants and agrees to pay the Total Purchase Price to the Seller on or about the Effective Date, and in any case no later than one business day after the Effective Date. The Seller agrees to accept payment for the Total Purchase Price via wire transfer of immediately available funds in United States Dollars (to a bank account designated in writing by the Seller) or USD Coin (USDC) (to a wallet address designated in writing by the Seller). A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in New York are open for business.

2. **TOKEN DELIVERY.**

    **2.1.** **Delivery.** Subject to the terms and conditions set forth herein, the Seller shall deliver to the Purchaser's wallet address compatible with receiving Tokens, in full satisfaction of this Agreement, the Number of Tokens Purchased; *provided*, for the avoidance of doubt, such delivered Tokens shall remain subject to the terms of this Agreement notwithstanding such delivery.

    **2.2.** **Conditions to Token Delivery.** In connection with, as a condition to, and prior to each delivery of Tokens by the Seller to the Purchaser:

    (a)  The Purchaser will deliver to the Seller any and all documentation to verify Purchaser's status as an accredited investor;

    (b)  The Purchaser will provide to the Seller, in writing, a wallet address at a mutually agreed custodian ("***Designated Custodian***") to which the Purchaser's Tokens will be delivered;

    (c)  The Purchaser will complete and deliver all AML and KYC forms/documentation requested by the Seller from time to time, including after the Effective Date;

(d) The Purchaser shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the Seller may reasonably request in order to carry out the intent and accomplish the restrictions set forth herein and/or as shall be requested to comply with then applicable laws and regulations.

**2.3. Lockup.**

(a) In addition to any other restrictions set forth herein, Purchaser agrees that it will not, at any time, directly or indirectly, Transfer (i) any Tokens that have not been released to the Purchaser in accordance with Exhibit A herein (such Tokens, the "*Unreleased Tokens*"), (ii) any options to purchase any Unreleased Tokens, or (iii) any instruments convertible into, exchangeable for, or that represent the right to receive Unreleased Tokens, including this Agreement and any Tokens hereunder. To ensure compliance with the restrictions in this Section 2.3, Purchaser further agrees to ensure that the Designated Custodian imposes technological lockups and restrictions on the Unreleased Tokens.

(b) As used herein, "*Transfer*" means, with respect to any instrument, the direct or indirect assignment, sale, transfer, tender, pledge, charge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or other disposition of such instrument or any right, title or interest therein, or the record or beneficial ownership thereof, the offer to make such a sale, transfer or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

**3. PURCHASER REPRESENTATIONS**

**3.1. Authorization.** The Purchaser has full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**3.2. Purchase Entirely for Own Account.** This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Seller, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Tokens to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, Transfer or grant participations to such Person or to any third Person, with respect to any of the Tokens. The Purchaser has not been formed for the specific purpose of acquiring the Tokens.

**3.3. Accredited Investor.** Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (i.e., (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000, (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year, (c) a corporation, limited liability company or partnership having total assets in excess of $5,000,000 that was not formed for the purpose of purchasing the Tokens pursuant to this Agreement, or (d) otherwise meets the requirements for an "accredited investor" under Regulation D promulgated by the Securities and Exchange Commission under the Securities Act). The Purchaser has submitted accurate and complete information to satisfy the accredited investor verification process required by the Seller.

**3.4. Risks and Experience.** The Purchaser has sufficient knowledge of and experience in business and financial matters to be able to evaluate the risks and merits of its purchase under this Agreement and of the Tokens and is able to bear the risks thereof. Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of its purchase. Purchaser understands, acknowledges and agrees that such knowledge allows Purchaser to appreciate the implications and risks of acquiring the Tokens.

**3.5. No General Solicitation**. At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television or other form of general advertising or solicitation in connection with the sale of the Tokens.

**3.6. Compliance with Securities Laws.** Purchaser understands and acknowledges that, to the extent the Tokens are ever considered by the U.S. Securities and Exchange Commission ("*SEC*") to be securities, the Tokens are not registered with the SEC under the U.S. Securities Act or any applicable state securities law, but instead are being issued under an exemption or exemptions from the registration and qualification requirements of the U.S. Securities Act and other applicable state securities laws which impose certain restrictions on each party to transfer the Tokens. The Purchaser understands that the Tokens may be deemed to bear any one or more of the following legends: (a) any legend that may be required by the securities laws of any state to the extent such laws are applicable to the Tokens, and (b): the following legend (and even without such legend the following restrictions apply):

> THE TOKENS PURCHASED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THE TOKENS HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM. THE TOKENS ARE BEING SOLD ONLY TO ACCREDITED INVESTORS (AS DEFINED UNDER THE SECURITIES ACT) (AND ONLY IN JURISDICTIONS WHERE SUCH OFFER AND SALE IS PERMITTED UNDER

APPLICABLE LAW) IN RELIANCE ON REGULATION D UNDER THE SECURITIES ACT. NO TRANSFER OF THE TOKENS MAY BE EFFECTED (1) PRIOR TO THE EXPIRATION OF THE LOCKUP PERIOD AND (2) WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT.

        **3.7.** **Other Applicable Law.** Purchaser represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the purchase of the Tokens, including (a) the legal requirements within the Purchaser's jurisdiction for the purchase of the Tokens, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Tokens. Purchaser represents that Purchaser's purchase and payment for and continued beneficial ownership of the Tokens will not violate any applicable laws of the Purchaser's jurisdiction.

**4.** **MUTUAL REPRESENTATIONS.**

        **4.1.** **Tax Liabilities**. Each party understands that each party bears sole responsibility for any taxes as a result of the matters and transactions that are the subject of this Agreement and may suffer adverse tax consequences as a result of its purchase, ownership, use, sale or other disposition of the Tokens. Further, each party represents that it has consulted any tax consultants it deems advisable in connection with the purchase or disposition of the Tokens and that each party is not relying on the other party for any tax advice.

        **4.2.** **No Illicit Funds.** Each party represents that the funds, including any fiat, virtual currency or cryptocurrency, that such party uses for the transactions contemplated under this Agreement are not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing, and Purchaser will not use Tokens to finance, engage in, or otherwise support any unlawful activities. All payments by the Purchaser under this Agreement will be made only in the Purchaser's name, from a digital wallet or bank account held in such party's name and under such party's control, and not located in a country or territory that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force, and is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the Financial Crimes Enforcement Network, as such regulations may be amended from time to time.

**5.** **DISCLAIMERS**

        **5.1.** **Force Majeure.** A party shall not be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement, including without limitation, sending the Tokens or USDC (if applicable) to the other party's wallet, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake, pandemics or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts,

4

or other civil unrest; (d) applicable law or regulations; or (e) action by any governmental authority.

        **5.2.** **No Warranty**. SELLER MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (c) WARRANTY OF TITLE; OR (d) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, EACH PARTY ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE OTHER PARTY, OR ANY OTHER PERSON ON THE OTHER PARTY'S BEHALF.

        **5.3.** **Indemnity**. NEITHER THE SELLER NOR ANY AFFILIATE OF THE SELLER SHALL BE LIABLE TO THE PURCHASER, AND THE PURCHASER WILL INDEMNIFY, DEFEND AND HOLD HARMLESS THE SELLER, ITS AFFILIATES, AND THEIR AGENTS AND ADVISORS, AND THE SUCCESSORS AND ASSIGNS OF THE FOREGOING, FROM AND AGAINST, ALL OR ANY PART OF ANY THIRD PARTY CAUSES OF ACTION, CLAIMS, LIABILITIES, LOSSES, COSTS, DAMAGES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY "*CLAIMS*") FOR DAMAGES TO OR LOSS OF PROPERTY ARISING OUT OF OR RESULTING FROM THE TRANSACTIONS CONTEMPLATED HEREIN OR PURCHASER'S VIOLATION OF THIS AGREEMENT, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE FROM THE FRAUD OR INTENTIONAL MISCONDUCT OF THE SELLER.

        **5.4.** **Limitation of Liability**. NEITHER THE SELLER NOR ANY OF THE SELLER'S AFFILIATES OR AGENTS OR ADVISORS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE ACTIVITIES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SELLER OR ANY OTHER PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED ITS ESSENTIAL PURPOSE. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY. EXCEPT FOR THE SELLER'S FRAUD OR INTENTIONAL MISCONDUCT, IN NO EVENT WILL THE TOTAL LIABILITY OF THE SELLER AND ITS AFFILIATES TO THE PURCHASER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD). THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE

FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SELLER AND THE PURCHASER.

**6.** **GENERAL PROVISIONS.**

**6.1.** **Notices.** Any notice required or permitted by this Agreement will be deemed sufficient when sent by email to the relevant address listed on the signature page hereto, as subsequently modified by written notice received by the appropriate party.

**6.2.** **Further Assurances.** The parties agree to execute, and Purchaser agrees to cause its affiliates to execute, such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**6.3.** **Titles and Headings.** The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement. Unless otherwise specifically stated, all references herein to "sections" will mean "sections" to this Agreement.

**6.4.** **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the Republic of Panama, without giving effect to the body of laws pertaining to conflict of laws.

**6.5.** **Dispute Resolution.** Any dispute, controversy or claim arising out of or relating to this contract, or the breach termination or invalidity thereof that cannot be settled through negotiation shall be settled by arbitration administered by the International Centre for Settlement of Investment Disputes ("*Center*") in accordance with its Arbitration Rules ("*Rules*") in force when the notice of arbitration is submitted. The law of this arbitration provision shall be Panama law. The number of arbitrators shall be one (1) to be appointed by the Center in accordance with the Rules. The arbitration proceedings shall be conducted in English. The decision of the sole arbitrator to any such dispute, controversy, difference or claim shall be final and binding upon both Parties. If any litigation or arbitration is necessary to enforce the terms of this Agreement, the prevailing party will be entitled to have their attorney fees paid by the other party. Each Party waives any right it may have to assert the doctrine of forum *non conveniens*, to assert that it is not subject to the jurisdiction of such arbitration or courts or to object to venue to the extent any proceeding is brought in accordance herewith.

**6.6.** **Transfers and Assigns.** Neither this Agreement nor the rights contained herein may be Transferred, by operation of law or otherwise, by the Purchaser without the prior written consent of the Seller. The Seller may assign this Agreement without the consent of the Purchaser.

**6.7.** **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**6.8. <u>Amendment and Waivers</u>.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this Section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance or of any other provision of this Agreement. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

**6.9. <u>Severability</u>.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the foregoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

**6.10. <u>Counterparts; Facsimile Signatures</u>.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or electronic mail (including .pdf or any electronic signature, e.g. www.docusign.com) and upon such delivery the signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[*Signature Page Follows*]

The undersigned have caused this Agreement to be duly signed by their authorized representatives.

| | |
|---|---|
| **Number of Tokens Purchased:** | 482,253.086 FTT Tokens |
| **Price Per Token (USD):** | USD $20.736 |
| **Purchase Price:** | USD $10,000,000.00 |

| | |
|---|---|
| **Number of Tokens Purchased:** | 15,243,902.439 SRM Tokens |
| **Price Per Token (USD):** | USD $0.656 |
| **Purchase Price:** | USD $10,000,000.00 |

| | |
|---|---|
| **Total Purchase Price:** | USD $20,000,000.00 |

**SELLER:**
Alameda TR Systems S. de R. L.

By: 

Name: Caroline Ellison

Title: Authorized Representative

Notice Address:

  Oceania Business Plaza, 21st floor,
  Punta Pacifica, Panama City,
  Republic of Panama
  Attention: Caroline Ellison
  Email: caroline@alameda-research.com


**PURCHASER:**
SkyBridge Capital II, LLC


By: _____

Name:  Brett S. Messing

Title:   President and Co-Chief Investment Officer

Notice Address:

527 Madison Avenue, 4th Floor

8

New York, NY 10022  
USA  
Attention: Marie Noble  
Email: mnoble@skybridge.com

# Exhibit A

*Lockup and Delivery Schedule*

The Number of Tokens Purchased shall be delivered and released to the Purchaser in accordance with the following schedule:

- None of the Number of Tokens Purchased shall be released prior to the day following the two-year anniversary of the Effective Date (the "**Release Date**").

- On the Release Date, all of the Number of Tokens Purchased shall be released.

Delivery of the applicable number of Tokens set forth above shall be deemed complete and to have complied with this Agreement as long as it is completed within ten (10) days of the applicable delivery date set forth above.