**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| - against - | |
| SKYBRIDGE CAPITAL II, LLC, SKYBRIDGE GP HOLDINGS LLC, DIGITAL MACRO FUND LP f/k/a SKYBRIDGE COIN FUND LP, SALT VENTURE GROUP LLC, ANTHONY SCARAMUCCI, and BRETT MESSING, | Adv. Pro. No. 24-50209 (KBO) |
| Defendants. | **Adv. Ref. No. 22** |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>COMPEL ARBITRATION AND TO DISMISS AND/OR STAY</u>**

## TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ........................................................................ 1

**BACKGROUND** ............................................................................................ 7

**ARGUMENT** ................................................................................................ 11

I.    **THIS MATTER SHOULD NOT BE REFERRED TO ARBITRATION** .......... 11

    A.    Defendants Have Not Established Arbitrability ............................................ 12

    B.    Arbitration Would Jeopardize the Objectives of the Bankruptcy Code ........ 13

II.   **THE COURT SHOULD DENY DEFENDANTS' MOTION TO STAY THESE PROCEEDINGS** ........................................................................ 19

    A.    The Resolution of the Non-Arbitrable Claims Would Not Depend on the Outcome of Arbitration of Counts 5 Through 9 ............. 20

    B.    Plaintiff Would Be Severely Prejudiced by a Stay of the Non-Arbitrable Claims Pending Arbitration of the Claim Objections .................................... 22

III.  **THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS** ................................................... 23

IV.   **DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) SHOULD BE DENIED IN ITS ENTIRETY** ............................. 26

    A.    Plaintiff Has Adequately Pled Claims for Actual Fraudulent Transfer ........................................................................................... 26

        1.    The Transactions Were Part and Parcel of the FTX Insiders' Fraudulent Scheme ................................................................. 27

        2.    Plaintiff Has Pled Badges of Fraud That Further Support an Inference of Fraudulent Intent ................................................. 34

        3.    The FTX Insiders Acted With Intent to Hinder, Delay, or Defraud Creditors by Putting Millions of Dollars Beyond Their Reach .............. 36

    B.    Plaintiff Has Adequately Pled Claims for Constructive Fraudulent Transfer ............................................................................ 37

        1.    The FTX Group Was Insolvent at the Time of the Transfers ................. 38

       2.      FTX Did Not Receive Reasonably Equivalent Value in the Transactions ................................................................... 39

              a.      The SALT Sponsorship and the SCF Investment ........................ 40

              b.      The SkyBridge Acquisition .......................................... 42

C.      Plaintiff Has Adequately Pled Unjust Enrichment (Counts 5 and 6) ............. 43

D.      Plaintiff Has Adequately Pled Breach of Contract Against Scaramucci and Messing (Count 7) .................................................. 45

E.      Plaintiff Has Adequately Pled Breach of Fiduciary Duties Against Scaramucci and Messing (Count 8) ................................................. 47

F.      Plaintiff Has Adequately Pled Aiding and Abetting Breach of Fiduciary Duty Against Scaramucci and Messing (Count 9) ........ 49

G.      Plaintiff Has Adequately Pled Disallowance of Claims and Property Recovery (Counts 10 and 11) .................................................. 52

**CONCLUSION** ...................................................................................................... 53

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*360 Campaign Consulting, LLC* v. *Diversity Communication, LLC*,
    2020 WL 1320909 (Del. Ch. Mar. 20, 2020) ......................................................... 12

*Alameda Research Ltd.* v. *Giles (In re FTX Trading Ltd.)*,
    2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ................................... 28, 31, 38

*Allen* v. *El Paso Pipeline GP Co.*,
    90 A.3d 1097 (Del. Ch. 2014) ................................................................................. 48

*In re AmCad Holdings, LLC*,
    2016 WL 3412289 (Bankr. D. Del. June 14, 2016) ................................................ 25

*In re APF Co.*,
    264 B.R. 344 (Bankr. D. Del. 2001) ......................................................... 14, 18, 19

*In re Aphton Corp.*,
    423 B.R. 76 (Bankr. D. Del. 2010) ................................................................... 39, 41

*ASARCO LLC* v. *Americas Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) ............................................................................... 37

*In re AstroPower Liquidating Trust*,
    335 B.R. 309 (Bankr. D. Del. 2005) ....................................................................... 24

*AT & T Technologies, Inc.* v. *Communications Workers of America*,
    475 U.S. 643 (1986) ................................................................................................ 12

*In re Atlas Energy Resources, LLC*,
    2010 WL 4273122 (Del. Ch. Oct. 28, 2010) ......................................................... 47

*Bandera Master Fund LP* v. *Boardwalk Pipeline Partners, LP*,
    2024 WL 4115729 (Del. Ch. Sept. 9, 2024) .......................................................... 43

*In re Bayou Group, LLC*,
    439 B.R. 284 (S.D.N.Y. 2010) ........................................................................ 30, 33

*In re BCF Management, Inc.*,
    320 B.R. 265 (Bankr. D. Del. 2005) ....................................................................... 40

*In re Bell & Beckwith*,
    64 B.R. 620 (Bankr. N.D. Ohio 1986) ............................................................. 30, 36,

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) ............................................................................... 26

*In re Bencharsky*,
2010 WL l309145 (Bankr. N.D. Cal. Jan. 19, 2010) ............................... 15

*BFP* v. *Resolution Trust Corp.*,
511 U.S. 531 (1994) ............................................................................... 40

*Black* v. *Montgomery County*,
835 F.3d 358 (3d Cir. 2016) ................................................................... 26

*In re Bullion Reserve of North America*,
836 F.2d 1214 (9th Cir. 1988) ........................................................... 33,

*In re BWI Liquidating Corp.*,
437 B.R. 160 (Bankr. D. Del. 2010) ....................................................... 25

*In re Caesars Entertainment Operating Co., Inc.*,
808 F.3d 1186 (7th Cir. 2015) ......................................................... 15–16

*In re Carrozzella & Richardson*,
237 B.R. 536 (Bankr. D. Conn. 1999) .................................................... 34

*In re Cencom Cable Income Partners, L.P.*,
2000 WL 130629 (Del. Ch. Jan. 27, 2000) ............................................. 48

*In re Charys Holding Co., Inc.*,
443 B.R. 628 (Bankr. D. Del. 2010) ....................................................... 39

*City of Pittsburgh Comprehensive Municipal Pension Trust Fund* v. *Conway*,
2024 WL 1752419 (Del. Ch. Apr. 24, 2024) .......................................... 44

*Clean Harbors, Inc.* v. *Safety-Kleen, Inc.*,
2011 WL 6793718 (Del. Ch. Dec. 9, 2011) ............................................ 46

*CMS Investment Holdings, LLC* v. *Castle*,
2015 WL 3894021 (Del. Ch. June 23, 2015) .......................................... 46

*In re Columbia Pipeline Group, Inc. Merger Litigation*,
299 A.3d 393 (Del. Ch. 2023) ................................................................ 51

*In re Commercial Financial Services, Inc.*,
322 B.R. 440 (Bankr. N.D. Okla. 2003) ................................................. 53

*CTF Hotel Holdings, Inc.* v. *Marriott International, Inc.*,
381 F.3d 131 (3d Cir. 2004) .......................................................... 22, 23

*In re D & B Swine Farms, Inc.*,
    430 B.R. 737 (Bankr. E.D.N.C. 2010) .................................................................. 16

*In re DBSI, Inc.*,
    477 B.R. 504 (Bankr. D. Del. 2012) .............................................................. 31, 34

*In re DBSI, Inc.*,
    2011 WL 1810632 (Bankr. D. Del. May 5, 2011) ................................................ 33

*In re Direct Response Media*,
    466 B.R. 626 (Bankr. D. Del. 2012) ...................................................................... 35

*In re Dole Food Co., Inc. Shareholder Litigation*,
    2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ........................................................ 51

*In re DSI Renal Holdings*,
    574 B.R. 446 (Bankr. D. Del. 2017) ........................................................ 35, 36, 49

*In re EBC I, Inc.*,
    380 B.R. 348 (Bankr. D. Del. 2008) ...................................................................... 40

*In re Ellswick*,
    2016 WL 3582586 (Bankr. N.D. Ala. June 24, 2016) .......................................... 14

*In re Empire Land, LLC*,
    2016 WL 1391297 (Bankr. C.D. Cal. Apr. 4, 2016) ............................................. 39

*In re EXDS, Inc.*,
    316 B.R. 817 (Bankr. D. Del. 2004) ...................................................................... 21

*In re FAH Liquidating Corp.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ................................................................ 38, 44

*In re FBI Wind Down, Inc.*,
    581 B.R. 387 (Bankr. D. Del. 2018) ................................................................. 41–42

*In re Fedders North America, Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...................................................................... 50

*Feeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012) .................................................................................. 13

*In re Fleming Cos.*,
    325 B.R. 687 (Bankr. D. Del. 2005) ...................................................................... 20

*Franlogic Scout Development, LLC* v. *Scott Holdings, Inc.*,
    2017 WL 2982396 (E.D. Pa. July 12, 2017) ......................................................... 12

*In re Freuhauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006) ...................................................... 40, 42

*In re FRG*,
   115 B.R. 72 (E.D. Pa. 1990) ............................................................... 19

*In re Friedman's, Inc.*,
   356 B.R. 779 (Bankr. S.D. Ga. 2005) ................................................ 14

*In re Garden Ridge Corp.*,
   338 B.R. 627 (Bankr. D. Del. 2006) ................................................... 39

*Garfield on Behalf of ODP Corp.* v. *Allen*,
   277 A.3d 296 (Del. Ch. May 24, 2022) ............................................. 43

*In re Grant*,
   281 B.R. 721 (Bankr. S.D. Ala. 2000) ............................................. 17,

*In re Hagerstown Fiber Ltd. P'ship*,
   277 B.R. 181 (Bankr. S.D.N.Y. 2002) ............................................... 21

*In re HH Liquidation, LLC*,
   590 B.R. 211 (Bankr. D. Del. 2018) ................................................... 46

*In re Independent Clearing House*,
   77 B.R. 843 (D. Utah 1987) .......................................................... 33, 34

*Ishimaru* v. *Fung*,
   2005 WL 2899680 (Del. Ch. Oct. 26, 2005) ..................................... 48

*Jacobs* v. *Meghji*,
   2020 WL 5951410 (Del. Ch. Oct. 8, 2010) ....................................... 45

*State ex rel. Jennings* v. *Monsanto Co.*,
   299 A.3d 372 (Del. 2023) ................................................................... 43

*King* v. *VeriFone Holdings, Inc.*,
   12 A.3d 1140 (Del. 2011) ..................................................................... 8

*Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*,
   560 F.3d 156 (3d Cir. 2009) ............................................................... 12

*In re Live Well Financial, Inc.*,
   652 B.R. 699, (Bankr. D. Del. 2023) ............................................ 31, 33

*In re Live Well Financial, Inc.*,
   2023 WL 3995900 (Bankr. D. Del. June 13, 2023) ................. 34, 35, 36

*In re Ludlow Hospital Society, Inc.*,
124 F.3d 22 (1st Cir. 1997) ..................................................................................... 15

*In re Mallinckrodt PLC*,
2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) .................................................. 27

*In re Manhattan Investment Fund Ltd.*,
397 B.R. 1 (S.D.N.Y. 2007) ...................................................................................... 33

*Manzo* v. *Rite Aid Corp.*,
2002 WL 31926606 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) ................. 48

*In re Maxus Energy Corp.*,
641 B.R. 467 (Bankr. D. Del. 2022) ....................................................................... 32

*In re May*,
591 B.R. 712 (Bankr. E.D. Ark. 2018) .................................................................. 15

*MBNA America Bank, N.A.* v. *Hill*,
436 F.3d 104 (2d Cir. 2006) .................................................................................... 14

*McDermott* v. *Clondalkin Group, Inc.*,
649 F. App'x 263 (3d Cir. 2016) ............................................................................ 49

*Mellon Bank, N.A.* v. *Metro Communications, Inc.*,
945 F.2d 635 (3d Cir. 1991), *as amended* (Oct. 28, 1991) .................................. 40

*Metcap Securities LLC* v. *Pearl Senior Care, Inc.*,
2009 WL 513756 (Del. Ch. Feb. 27, 2009) ..................................................... 43–44

*In re Millennium Lab Holdings II, LLC*,
2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ................................. 26, 27, 34

*Miller* v. *Mott*,
2023 WL 6467368 (Bankr. D. Del. Oct. 4, 2023) ............................................... 52

*In re MPC Computers, LLC*,
465 B.R. 384 (Bankr. D. Del. 2012) ............................................................ 24, 25

*MSKP Oak Grove, LLC* v. *Venuto*,
839 Fed. Appx. 708 (3d Cir. 2020) ....................................................................... 27

*In re National Audit Defense Network*,
367 B.R. 207 (Bankr. D. Nev. 2007) .............................................................. 33–34

*Nemec* v. *Shrader*,
991 A.2d 1120 (Del. 2010) ..................................................................................... 43

*In re New Century TRS Holdings, Inc.*,
    497 B.R. 558 (Bankr. D. Del. 2009) ..................................................... 14

*In re Nu Ride Inc.*,
    2024 WL 4376130 (Bankr. D. Del. Oct. 1, 2024) ................................. 19

*In re Our Alchemy, LLC*,
    2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ............................. 44

*In re Our Alchemy, LLC*,
    642 B.R. 155 (Bankr. D. Del. 2022) ..................................................... 26

*In re Paragon Offshore PLC*,
    588 B.R. 735 (Bankr. D. Del. 2018) ..................................................... 20

*Parfi Holding AB* v. *Mirror Image Internet, Inc.*,
    817 A.2d 149 (Del. 2002) ...................................................................... 13

*Peltz* v. *Hatten*,
    279 B.R. 710 (D. Del. 2002) ..................................................................40

*In re PennySaver USA Publishing, LLC*,
    587 B.R. 43 (Bankr. D. Del. 2018) ................................................ 4, 23

*In re PennySaver USA Publishing, LLC*,
    602 B.R. 256 (Bankr. D. Del. 2019) ..................................................... 35

*In re Penson Worldwide*,
    587 B.R. 6 (Bankr. D. Del. 2018) ......................................................... 15

*Phillips* v. *County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) .................................................................. 46

*In re Pursuit Capital Management*,
    595 B.R. 631 (Bankr. D. Del. 2018) ......................................... 13, 19, 22

*In re Qimonda Richmond, LLC*,
    467 B.R. 318 (Bankr. D. Del. 2012) ............................................... 39, 42

*In re Resorts International, Inc.*,
    372 F.3d 154 (3d Cir. 2004) .............................................................23, 26

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996) .................................................................... 40

*In re Russell*,
    402 B.R. 188 (Bankr. N.D. Miss. 2009) ............................................... 15

*Ryan* v. *Buckeye Partners, L.P.*,
 2022 WL 389827 (Del. Ch. Feb. 9, 2022) ..................................................... 50–51

*In re Sentinel Management Group, Inc.*,
 728 F.3d 660 (7th Cir. 2013) ........................................................................ 36

*In re Sharp International Corp.*,
 403 F.3d 43 (2nd Cir. 2005) ......................................................................... 30

*Shearson/American Express, Inc.* v. *McMahon*,
 482 U.S. 220 (1987) ................................................................................. 3, 13

*In re Solutions Liquidation LLC*,
 608 B.R. 384 (Bankr. D. Del. 2019) ............................................................. 50

*Stein* v. *Blankfein*,
 2019 WL 2323790 (Del. Ch. May 31, 2019) ................................................ 49

*In re Sunset Aviation, Inc.*,
 468 B.R. 641 (Bankr. D. Del. 2011) ............................................................. 39

*In re Syntax-Brillian Corp*,
 2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ........................... 26, 27, 31, 37

*In re Thorpe Insulation Co.*,
 671 F.3d 1011 (9th Cir. 2012) ............................................................ 16, 17, 18

*Travelers Indemnity Co.* v. *Bailey*,
 557 U.S. 137 (2009) .................................................................................... 38

*In re Tribune Co.*,
 418 B.R. 116 (Bankr. D. Del. 2009) ..............................................................17

*In re Tronox Inc.*,
 503 B.R. 239 (Bankr. S.D.N.Y. 2013) ......................................................... 37

*In re Trump Entertainment Resorts, Inc.*,
 534 B.R. 93 (Bankr. D. Del. 2015) ............................................................... 16

*Tygon Peak Capital Management, LLC* v. *Mobile Investments Investco, LLC*,
 2022 WL 34688 (Del. Ch. Jan. 4, 2022) ...................................................... 46

*U.S. Wireless Corp.*,
 384 B.R. 713 (Bankr. D. Del. 2008) ............................................................. 19

*In re UD Dissolution Corp.*,
 629 B.R. 11 (Bankr. D. Del. 2021) ............................................................... 49

*In re Venoco, LLC,*
    596 B.R. 480 (Bankr. D. Del. 2019) ................................................................ 24,

*VFB LLC* v. *Campbell Soup Co.,*
    482 F.3d 624 (3d Cir. 2007) ................................................................ 39, 42

*In re W.J. Bradley Mortgage Capital, LLC,*
    598 B.R. 150 (Bankr. D. Del. 2019) ................................................................ 50

*In re Weiand Automotive Industries,*
    612 B.R. 824 (Bankr. D. Del. 2020) ................................................................ 25

*Wells Fargo Bank, N.A.* v. *Estate of Malkin,*
    278 A.3d 53 (Del. 2022) ................................................................ 43

*Weyerhaeuser Co.* v. *Domtar Corp.,*
    61 F. Supp. 3d 445 (D. Del. 2014), *aff'd*, 721 F. App'x 186 (3d Cir. 2018) ........................ 47

*In re Yarbrough,*
    2010 WL 3885046 (Bankr. M.D. Ala. Sept. 29, 2010) ................................................................ 15

*In re Yellow Corp.,*
    2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024) ................................................................ 14, 19

*Zazzali* v. *AFA Financial Group, LLC,*
    2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012). ................................................................ 33

### STATUTES AND RULES

11 U.S.C. §105(a) ................................................................ 15

11 U.S.C. § 502(d) ................................................................ 15, 18, 54

11 U.S.C. § 548(a)(1)(A) ................................................................ 26

11 U.S.C. § 550(a)(1) ................................................................ 54

11 U.S.C. § 554(b) ................................................................ 26

26 U.S.C. § 157(b)(2)(B) ................................................................ 15

28 U.S.C. § 1334(b) ................................................................ 4, 23, 24

Del. Code Ann. tit. 6, § 1304(a)(1) ................................................................ 26

Del. Code Ann. tit. 6, § 18-1001 ................................................................ 48

Fed. R. Civ. P. 9(b) ................................................................ 27

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 26

Fed. R. Civ. P. 18(b) ................................................................................................. 52

Fed. R. Bankr. P. 7018 ............................................................................................. 52

Plaintiff FTX Recovery Trust respectfully submits this opposition to Defendants' Motion to Compel Arbitration and to Dismiss and/or Stay [Adv. D.I. 22] (the "<u>Motion</u>" or "<u>Mot.</u>") filed on January 24, 2025 in the above-captioned adversary proceeding.

## PRELIMINARY STATEMENT

No fraud can continue indefinitely.  Eventually, without a constant flow of new money, the scheme will unravel, and somebody will be left holding the bag.  In one of the largest frauds in history, Samuel Bankman-Fried and the other FTX Insiders[2] commingled billions of dollars of customer deposits with other FTX Group funds and used the money to purchase lavish homes and private jets; to expand their personal wealth and sphere of influence through, among other things, political and "charitable" contributions; and to make "investments" that often made no economic sense.

To keep his fraudulent scheme afloat, Bankman-Fried had to answer two key questions: *where* can new money be found, and *who* can be relied on to locate it?  Throughout 2022, Bankman-Fried hoped that the answer to these questions lay, in part, with Defendant Anthony Scaramucci and his partners (including Defendant Brett Messing) at SkyBridge Capital II, LLC ("<u>SkyBridge II</u>") and its subsidiaries and affiliates (together, "<u>SkyBridge</u>").  Scaramucci—a fixture in the financial world, a political gadfly, and an inveterate self-promoter—had exactly the connections to deep-pocketed investors that could sustain Bankman-Fried's fraud, which faced an increasing risk of collapse.  To perpetuate his fraudulent scheme, Bankman-Fried invested millions of dollars of commingled FTX Group funds into his

---

[2]    As used herein and in the Complaint, "<u>FTX Insiders</u>" refers collectively to Bankman-Fried and three other executives within the FTX Group:  Gary "Zixiao" Wang (a co-founder of Alameda Research Ltd., West Realm Shires, Inc., and West Realm Shires Services, Inc.); Nishad Singh (a co-founder of West Realm Shires, Inc. and West Realm Shires Services, Inc.), and Caroline Ellison (CEO of Alameda Research Ltd.).  (*See* Compl. ¶¶ 34–38.)

relationship with Defendants. In return for those investments, Bankman-Fried hoped Defendants would introduce him to potential investors that could fill the ever-growing hole in the FTX Group's balance sheet and prevent the massive fraud from coming to light.

For a while, Bankman-Fried and the other FTX Insiders were able to fool creditors, regulators, and the market into believing that the FTX Group was a profitable and growing enterprise. But a liquidity crisis in November 2022 revealed the depths of the FTX Group's insolvency, putting an end to the fraud, triggering the FTX Group's inevitable collapse, and ultimately resulting in the criminal convictions and guilty pleas of Bankman-Fried and other FTX Group Insiders. Bankman-Fried is now serving a lengthy prison term, but the FTX Group's creditors are left holding the bag.

In 2022, before it all fell apart, Bankman-Fried scrambled to find new sources of funds. To secure Scaramucci's assistance, Bankman-Fried showered him and SkyBridge with lavish, completely uneconomic "investments," including a $12 million agreement to sponsor Scaramucci's SALT Conference (the "SALT Sponsorship"), a $10 million investment in the underperforming SkyBridge Coin Fund (the "SCF Investment"), and a $45 million purchase of a 30% stake in SkyBridge itself (the "SkyBridge Acquisition") (together, the "Transactions"). These "investments" totaled at least $67 million, and were all paid for using improperly commingled and misappropriated FTX Group funds. As Defendant Skybridge II has conceded, Defendants "partnered with a 'house of cards' built 'on a foundation of deception'." (Proof of Claim No. 4697 ¶ 1 [Adv. D.I. 31-6], and together with Proof of Claim No. 5126 [Adv. D.I. 31-7], the "Proofs of Claim".)

Through these Transactions, Defendants profited handsomely in the FTX Group's final days before its collapse. And Defendants continued to profit from the SkyBridge

Acquisition thereafter, considering the $40 million in cryptocurrencies that SkyBridge received as part of the acquisition, which have appreciated, in some instances, over 300%.  Not content with these massive gains, Defendants have tried to extract even more value from the FTX Group, first pressuring the collapsing FTX Group to walk away from the SkyBridge acquisition for nothing (Compl. ¶¶ 98–99) and then filing meritless claims for another $53 million as a purported creditor of the bankruptcy estate (Compl. ¶¶ 101–02).  Now Defendants seek to prevent or delay the recovery of funds for creditors by forcing Plaintiff into multiple costly and inefficient arbitrations and staying or dismissing its claims.  Defendants' Motion fails for multiple reasons.

*First*, Defendants' attempt to compel arbitration of Plaintiff's claims for unjust enrichment, breach of contract, and breach of fiduciary duties (Counts 5 through 9), as well as Plaintiff's objections to Defendants' Proofs of Claim (Counts 12 and 13), is unavailing.  Although Defendants concede that Plaintiff's Bankruptcy Code claims are non-arbitrable and must be heard by this Court, they nonetheless seek to split this litigation up into pieces by compelling arbitration for only a portion of Plaintiff's claims.  But regardless of the existence of arbitration provisions in some, but not all, of Bankman-Fried's agreements with Defendants, Defendants have not met their burden of demonstrating that these particular disputes fall within the scope of those provisions.  And even if they had, both the claim objections and Plaintiff's common law claims arising out of Defendants' post-petition conduct fall squarely within the domain of the Bankruptcy Court.  Arbitration would also present an "inherent conflict" with "the [Bankruptcy Code's] underlying purposes," *Shearson/Am. Exp., Inc.* v. *McMahon*, 482 U.S. 220, 227 (1987), as it would result in (i) decentralization of purely bankruptcy issues, especially with respect to Plaintiff's claim objections and causes of action arising out of post-petition conduct;

(ii) piecemeal litigation, which risks inconsistent results and wastes resources, (iii) inefficient and uneconomical use of estate assets, which is at odds with the Bankruptcy Code's purpose of conserving estate assets, and (iv) prejudice to the interests of other creditors, including by disrupting the equality of distribution.

*Second*, Defendants' attempt to stay the rest of this case while arbitration plays out is a naked stalling tactic. While Plaintiff's Bankruptcy Code claims (which Defendants concede are appropriately before this Court) and Plaintiff's remaining causes of action (which Defendants assert are arbitrable) generally arise from the same set of Transactions, they are not dependent on one another and can proceed separately if needed. Plaintiff's core bankruptcy claims primarily sound in fraud and will turn on the *Debtors'* conduct and intent when entering into the Transactions (pre-petition). The purportedly arbitrable claims, on the other hand, arise primarily out of the contractual and fiduciary duties that Defendants incurred as a result of the agreements they entered into with Debtors and by virtue of their management roles in SkyBridge II, and therefore will turn on *Defendants'* conduct and financial status after the Transactions closed (post-petition). The Court should thus decline to exercise its discretion to stay these proceedings pending any arbitration.

*Third*, Defendants' argument that this Court lacks subject matter jurisdiction over Plaintiff's state law claims is unavailing. This Court has jurisdiction over Plaintiff's state law claims because they are "related to" the bankruptcy proceedings. *In re PennySaver USA Publ'g, LLC*, 587 B.R. 43, 48 (Bankr. D. Del. 2018); *see* 28 U.S.C. § 1334(b). Defendants dismiss the reservation of jurisdiction in the Chapter 11 Plan of Reorganization of FTX Trading Ltd. [D.I. 26404] (the "Plan") as failing to "specifically describe" the non-core claims over which it grants

jurisdiction (Mot. at 21), but case law, including precedent in this Court, gives effect to such broadly worded provisions in reorganization plans.

*Fourth*, Defendants advance a host of purportedly disabling issues with Plaintiff's pleadings, all of which fail under closer examination:

***Actual Fraudulent Conveyance.***    Plaintiff has plausibly alleged its actual fraudulent conveyance claims (Counts 1 and 2) under multiple independently sufficient theories of intent to hinder, delay, or defraud.  Plaintiff alleges that the Transactions were the product of the larger fraud at the FTX Group because the assets used for the Transactions were commingled FTX Group funds largely obtained through fraud, and that the Transactions were in furtherance of the fraudulent scheme because they were entered for the purpose of gaining access to Defendants' network of prospective investors, who were necessary to fill the hole in FTX's balance sheet and thereby perpetuate the fraud.  Fraudulent intent may also be presumed where, as here, a scheme exists whereby later acquired funds are used to pay off previous investors and the transaction at issue was in furtherance of that scheme.  Moreover, although not necessary, the Complaint alleges numerous badges of fraud tainting the Transactions, including the close relationship between Bankman-Fried and Scaramucci, the hasty manner in which the Transactions were conducted, the lack of reasonably equivalent value received in exchange for the transfers, and the FTX Group's insolvency at the time of the Transactions.

***Constructive Fraudulent Conveyance, Disallowance, and Property Recovery.*** Plaintiff has also adequately pled claims of constructive fraudulent conveyance (Counts 3 and 4). The Debtors were unquestionably insolvent at the time of the Transactions, and in no instance did they receive reasonably equivalent value in exchange for any of the commingled and

misappropriated funds transferred to Defendants.  For these same reasons, Plaintiff's claims for disallowance of claims and property recovery (Counts 10 and 11) are also sufficiently pled.

**_Unjust Enrichment._**  Plaintiff's claims for unjust enrichment (Counts 5 and 6) are likewise adequately pled.  Plaintiff properly pleads that Defendants were enriched via a series of wrongful acts in connection with the Transactions.  And Defendants' argument that unjust enrichment is unavailable as a remedy without establishing the absence of a remedy at law is premature at the pleading stage, when Plaintiff may advance alternative theories of recovery.

**_Breach of Contract and Breach of Fiduciary Duties._**  Plaintiff also has adequately pled claims for breach of contract and breach of fiduciary duties as to Scaramucci and Messing (Counts 7 and 8).  Some of the theories that Defendants put forward to try to defeat these claims at the pleading stage are grounded in a faulty reading of the Complaint.  For example, Defendants argue that Scaramucci and Messing are exculpated from liability in their role as directors due to a clause in SkyBridge II's Fifth Amended and Restated Limited Liability Company Agreement (the "SkyBridge II LLCA"), but that clause does not shield them against acts of gross negligence, which Plaintiff has pled here.  Other arguments that Defendants raise are not properly considered at this time, including the fact-based arguments that Defendants have not sold the Bitcoin ("BTC") and Solana ("SOL") cryptocurrencies that they were required to segregate under the terms of the SkyBridge Acquisition and that Defendants covered any losses by selling FTT (FTX's native cryptocurrency token) and Serum ("SRM") tokens.  These arguments conflict with the well-pled allegations in the Complaint, and are thus improperly considered on a motion to dismiss.

**_Aiding and Abetting Breach of Fiduciary Duty._**  Lastly, Plaintiff has adequately alleged that Scaramucci and Messing aided and abetted Bankman-Fried's breach of the fiduciary

duty he owed to Debtor Island Bay Ventures ("Island Bay") (Count 9).  The Complaint properly alleges that Scaramucci and Messing knowingly participated in Bankman-Fried's breaches of fiduciary duty by repeatedly approaching Bankman-Fried and proposing that he enter transactions on behalf of the FTX Group that were facially disadvantageous to the FTX Group but personally benefitted Bankman-Fried (and themselves), with knowledge that such transactions did not provide and had virtually no prospect of providing the FTX Group with reasonably equivalent value.

The Court should deny Defendants' motion in full.

## **BACKGROUND**

The FTX Insiders have now all admitted to—or, in ringleader Bankman-Fried's case, been found guilty by a jury of engaging in—a massive criminal fraud on the FTX Group and its customers, which enabled the FTX Insiders to spend lavishly for their personal benefit, including on purported "investments." (Compl. ¶¶ 48–57.)  These "investments," made with commingled and misappropriated FTX Group funds, conveyed little to no benefit to the FTX Group, and instead served only to prop up Bankman-Fried's standing in the worlds of politics and traditional finance.  (Compl. ¶ 7.)  The Skybridge Transactions were three such "investments." (Compl. ¶¶ 15, 57.)

Scaramucci—a hedge fund manager who had a brief stint as White House Communications Director—and Bankman-Fried were introduced via email in March 2021. (Compl. ¶¶ 8, 63.)  Within a month, Bankman-Fried agreed that FTX would sponsor one of Scaramucci's SALT conferences for $750,000.  (Compl. ¶ 63.)  In January of 2022, Bankman-Fried formalized his relationship with Scaramucci with the SALT Sponsorship, an agreement to pay $12 million of FTX Group funds to sponsor a series of Scaramucci's SALT conferences and podcast episodes.  (Compl. ¶ 10.)  On January 12 and April 14 of 2022, FTX

transferred an initial $2 million of commingled Debtor funds to SALT pursuant to the SALT Sponsorship Agreement.  (Compl. ¶ 66.)

In March of 2022, Bankman-Fried deepened the FTX Group's ties with Scaramucci by directing Alameda Research Ventures to make the SCF Investment, a $10 million investment in the SkyBridge Coin Fund ("SCF")—a fund managed by SkyBridge II that focused on trading in cryptocurrency assets.  (Compl. ¶ 11.)  The Head of FTX Ventures Ltd. immediately raised concerns about the investment, noting that it was illogical for the experienced cryptocurrency traders at FTX to pledge their money to a fund run by the underperforming and inexperienced SkyBridge, but Bankman-Fried overrode her concerns and approved the investment.  (Compl. ¶ 67.)  On April 1, 2022, Alameda Research Ventures transferred $10 million of commingled Debtor funds to SCF.  (Compl. ¶ 68.)

Around the middle of 2022, as the cryptocurrency market declined, both FTX and Skybridge came under pressure.  (Compl. ¶¶ 6, 14.)  The market downturn and Bankman-Fried's runaway spending were making it increasingly difficult to meet cash flow needs at the FTX Group.  (Compl. ¶ 6.)  This drove Bankman-Fried to double down on his search for connections—like Scaramucci—that could bring in new investors to bail him out and allow him to cover up and continue his fraud.  (Compl. ¶¶ 7, 15.)  Meanwhile, Skybridge was suffering significantly, with its assets under management dropping from a high of $9 billion to a mere $2.2 billion, due to its overexposure to cryptocurrency investments.  (Compl. ¶¶ 14, 62, 69–70.)

Seeking a bailout of his own for his failing company, Scaramucci invited Bankman-Fried to lunch in the Bahamas.  (Compl. ¶ 71.)  At this lunch, Scaramucci presented a rosy view of SkyBridge's financial condition, telling Bankman-Fried that SkyBridge was "small, [but] still profitable," despite the pressure it had recently been under.  (Compl. ¶ 71.)

Bankman-Fried agreed to the general terms of a deal during the lunch meeting.[3]  On September 7, 2022—just two months before the Petition Date, and after only bare-bones due diligence—Bankman-Fried agreed to invest in Skybridge under highly unfavorable terms (the "SkyBridge Acquisition"), in a desperate attempt to locate potential sources of funds to fill the hole in the FTX Group balance sheet that he had created.  (Compl. ¶ 72.)  Bankman-Fried invested $45 million in exchange for a 30% stake in the operating companies for Scaramucci's hedge funds, SkyBridge II and SkyBridge GP Holdings LLC ("SkyBridge GP").  (Compl. ¶¶ 13, 73.)  That same day, also as part of the SkyBridge Acquisition, SkyBridge II executed the SkyBridge II LLCA, which directed SkyBridge II to use $40 million of the $45 million purchase price to purchase cryptocurrency in the form of $10 million each of BTC, SOL, FTT, and SRM (together, the "Purchased Cryptocurrencies").  (Compl. ¶¶ 74–75.)

The SkyBridge Acquisition made no economic sense for the FTX Group: Bankman-Fried and Scaramucci agreed that the FTX Group would commit nearly 90% of the acquisition price to purchase a basket of cryptocurrencies that the FTX Group could have easily and less expensively purchased itself, trading $45 million in cash for a roughly $12 million interest (30% of $45 million) in cryptocurrencies.  (Compl. ¶ 13.)[4]  Nor did it make any business sense.  The terms overwhelmingly favored Skybridge at the Debtors' expense:  the SkyBridge II LLCA gave Island Bay no voting rights in connection with its membership interests; Island Bay

---

[3]    (See Compl. ¶ 79 (citing Madison Darbyshire et al., *Sam Bankman-Fried Made $45mn Bet on SkyBridge with Crypto Strings Attached*, FINANCIAL TIMES (Sept. 12, 2022), https://www.ft.com/content/57407389-a4c6-4d93-91c4-014853748540).)

[4]    Indeed, Bankman-Fried controlled the supply of FTT, and his strategy to have Defendants purchase FTT was strictly a strategy to pump the market value of the FTT collateral used by Alameda to misappropriate customer funds.  Defendants have already conceded that the price of FTT was "inflated" at the time of the SkyBridge Acquisition.  (Proof of Claim No. 4697 ¶ 20.)

was not entitled to withdraw any capital contributions; and, despite its 30% interest, Island Bay received no seats on the SkyBridge Board of Managers.  (Compl. ¶¶ 80–82.)

The unfavorable terms of the SkyBridge Acquisition made no difference to Bankman-Fried.  (Compl. ¶ 89.)   More important to him was Scaramucci's Rolodex, with connections including world leaders, major figures from the Trump administration, and Wall Street power players.  (Compl. ¶ 89.)  Bankman-Fried went straight to work making use of Scaramucci's connections.  (Compl. ¶ 90.)  In September and October 2022, Bankman-Fried and Scaramucci embarked on a whirlwind tour to meet with potential investors—including the crown prince of Saudi Arabia and the President of the United Arab Emirates—in a desperate attempt to raise funds for, and thereby cover up and continue the fraud at, FTX.  (Compl. ¶¶ 16, 91–94.)

On November 7, 2022, just days before the Petition Date, Scaramucci received a call from Joseph Bankman (Bankman-Fried's father, with whom Scaramucci had also developed a personal relationship) asking for "rescue funding."  (Compl. ¶ 96.)  Scaramucci immediately flew down to the Bahamas to meet with Bankman-Fried.  (Compl. ¶ 96.)  On November 9, 2022, equipped with knowledge from the November 7 Bahamas meeting, Brett Messing (SkyBridge President, Co-Chief Investment Officer, and member of the Board of Managers) emailed FTX seeking to secure a sweetheart deal in advance of the exchange's imminent collapse.  (Compl. ¶¶ 97–99.)  No one replied to his email.  (Compl. ¶ 99.)  Between November 2022 and January 2023, SkyBridge disposed of its holdings of FTT and SRM without obtaining Island Bay's consent, in breach of the SkyBridge II LLCA.  (Compl. ¶ 100.)

By late 2023, it became apparent that Scaramucci and Messing had, at best, grossly mismanaged SkyBridge's assets and, at worst, looted the assets for themselves.  (Compl. ¶ 103.)  An unaudited SkyBridge II balance sheet from December 2023 shows that SkyBridge II

held "Digital Assets" of only *$20 million*.  (Compl. ¶ 104.)  But because SkyBridge II should still have held the BTC and SOL purchased under the SkyBridge II LLCA at this time, its December 2023 balance sheet should have reflected "Digital Assets" of at least *$60 million*— which, today, are worth in excess of *$100 million*.  (Compl. ¶ 104.)  As a result of this misconduct, SkyBridge's value has plummeted.  (Compl. ¶ 105.)  Seventy percent of investors in SkyBridge's crypto-focused fund have sought to exit, even though cryptocurrency prices have rallied since 2022.  (Compl. ¶ 105.)  Despite this collapse, Scaramucci and Messing have continued to pay themselves outsized salaries as officers of SkyBridge II.  (Compl. ¶ 105.)

On June 29, 2023, Defendants filed the Proofs of Claim in the Bankruptcy proceeding, seeking to recover (i) $45 million in purported unliquidated damages in connection with the SkyBridge Acquisition and (ii) $8 million arising from the SALT Sponsorship Agreement.[5]  (Compl. ¶¶ 21, 101.)  On November 8, 2024, Plaintiff's predecessors-in-interest filed this lawsuit to object to Defendants' Proofs of Claim and seek other recovery.

## ARGUMENT

## I.    THIS MATTER SHOULD NOT BE REFERRED TO ARBITRATION.

The Court should deny Defendants' Motion to Compel Arbitration because (i) Defendants have not established that a valid agreement to arbitrate governs these particular disputes, and (ii) even if they had, arbitration would be fundamentally at odds with the underlying purposes of the Bankruptcy Code.

---

[5]    There is a $2 million "gap" between the total price of the SALT Sponsorship Agreement and SALT's claim plus previously paid amounts.  This is due to certain discounts provided for in the agreement.

A.       **Defendants Have Not Established Arbitrability.**

"[B]efore compelling arbitration pursuant to the Federal Arbitration Act, a court must determine that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis* v. *Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009). "It is the movant's burden" to demonstrate both prerequisites. *Franlogic Scout Dev., LLC* v. *Scott Holdings, Inc.*, 2017 WL 2982396, at *6 (E.D. Pa. July 12, 2017). The "presumption in favor of arbitration 'does not apply'" to this inquiry. *Kirleis*, 560 F.3d at 160. Defendants make no showing that Plaintiff's claims for unjust enrichment, breach of fiduciary duties, or aiding and abetting, or Plaintiff's claim objections, "relate[] to" or "arise[] out of or in connection with" the relevant agreements. (Mot. at 17 (citations omitted).) Nor do they even specify which agreement's arbitration provision allegedly applies to which of Plaintiffs' claims. Defendants have therefore failed to meet their burden of demonstrating arbitrability. *See AT & T Techs., Inc.* v. *Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."); *Franlogic*, 2017 WL 2982396, at *6 (denying motion to compel arbitration where movants "have not yet met their burden of demonstrating that this dispute falls within the scope of the [contract's] arbitration clause").

With respect to Plaintiff's unjust enrichment claim, Defendants elsewhere argue that such a claim is viable only to the extent that there *is no applicable governing contract*. (Mot. at 53.) If true, then the unjust enrichment claim by definition cannot arise out of any of the relevant contracts. *See 360 Campaign Consulting, LLC* v. *Diversity Commc'n, LLC*, 2020 WL 1320909, at *9 (Del. Ch. Mar. 20, 2020) (unjust enrichment claim not arbitrable because "an unjust enrichment claim only applies in the event that the [contract] does not govern," and thus

does not "relate to any contract right"). Thus, neither Count 5 nor 6 are within the scope of any arbitration clause.

Plaintiff's breach of fiduciary duties claim against Scaramucci and Messing (Count 8) also is not covered by any arbitration provision. Defendants' fiduciary responsibilities arise not from the contracts but from Delaware law, by virtue of their seats on the Board of Managers and respective positions as Managing Partner and President of SkyBridge II. *See In re Pursuit Cap. Mgmt., LLC*, 595 B.R. 631, 671–72 (Bankr. D. Del. 2018) (breach of fiduciary duties claim "not based on provisions" of contracts underlying dispute but "on fiduciary obligations arising under state law"); *Feeley* v. *NHAOCG, LLC*, 62 A.3d 649, 656 (Del. Ch. 2012) ("[P]urportedly independent actions [such as a breach of fiduciary duties claim] do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract.") (quoting *Parfi Holding AB* v. *Mirror Image Internet, Inc.*, 817 A.2d 149, 156 n.24 (Del. 2002)).

Nor does Plaintiff's claim for aiding and abetting Bankman-Fried's breach of fiduciary duty (Count 9) arise out of or relate to any of the agreements containing arbitration provisions. Defendants' tortious conduct took place *before* the relevant agreements existed (primarily during the introduction and negotiation of the various deals), and is premised on duties owed by Bankman-Fried to the FTX Group rather than any duties created by virtue of the agreements with Defendants. *See Parfi Holding*, 817 A.2d at 156 ("[A]rbitration clauses should be applied only to claims that bear on the duties and obligations under the Agreement.").

## B. Arbitration Would Jeopardize the Objectives of the Bankruptcy Code.

Notwithstanding an otherwise applicable arbitration provision, Bankruptcy Courts may deny arbitration where, as here, there is an "inherent conflict between arbitration and the [Bankruptcy Code's] underlying purposes." *McMahon*, 482 U.S. at 227. To determine whether

such a conflict exists, courts look to the purposes of the Bankruptcy Code, which include "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 571 (Bankr. D. Del. 2009) (quoting *In re Friedman's, Inc.*, 356 B.R. 779, 784 (Bankr. S.D. Ga. 2005)). Bankruptcy Courts also consider "[t]he efficient resolution of claims" and "equality of distribution." *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001). Here, arbitration of Plaintiff's claims would undermine all of these fundamental purposes of the Bankruptcy Code.

*First*, arbitration would undermine the Bankruptcy Code's "goal of centralized resolution of purely bankruptcy issues." *MBNA Am. Bank, N.A.* v. *Hill*, 436 F.3d 104, 108 (2d Cir. 2006). Arbitration of Plaintiff's claims would significantly frustrate this goal—especially with respect to Plaintiff's claim objections (Counts 12–13) and Plaintiff's claims for unjust enrichment (Count 6), breach of contract (Count 7), and breach of fiduciary duties (Count 8), which arise, in whole or in part, from Defendants' *post-petition* conduct.

With respect to Plaintiff's claim objections, "[t]he Supreme Court has made clear that the claims allowance process is at the heart of a bankruptcy court's jurisdiction over the property of the bankruptcy estate." *In re Yellow Corp.*, 2024 WL 1313308, at *10 (Bankr. D. Del. Mar. 27, 2024). Claim disputes—*i.e.*, disputes about what entitlement a claimant may have to a distribution of estate assets—are "purely bankruptcy issues." *Hill*, 436 F.3d at 108. As such, courts have repeatedly declined to compel arbitration of claim disputes, finding that arbitration of such disputes is in particular conflict with the goals of the Bankruptcy Code, including the centralization of bankruptcy disputes. *See, e.g.*, *Yellow Corp.*, 2024 WL 1313308, at *7; *In re Ellswick*, 2016 WL 3582586, at *4–5 (Bankr. N.D. Ala. June 24, 2016) (declining to

compel arbitration of claims dispute); *In re May*, 591 B.R. 712, 724 (Bankr. E.D. Ark. 2018) (same); *see also In re Penson Worldwide*, 587 B.R. 6, 12 (Bankr. D. Del. 2018) (claim objection filed post-confirmation is a "core" bankruptcy claim under 26 U.S.C. § 157(b)(2)(B)).[6]

Moreover, Plaintiff's objections are to claims arising out of the SkyBridge Acquisition and the SALT Sponsorship, two transactions that are also at the heart of the "purely bankruptcy" fraudulent transfer claims (Counts 1–4). To sever the fraud claims from the objections would flout the purpose of centralization. Indeed, the Bankruptcy Code explicitly envisions the consolidation of these claim disputes with the related fraud claims: Section 502(d) provides that claims "of any entity from which property is recoverable" by way of a fraudulent transfer claim "shall [be] disallowed" until such time "such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable." 11 U.S.C. § 502(d). (*See also* Compl. ¶¶ 157–160 (alleging cause of action for claim disallowance under section 502(d)).)

Like Plaintiff's claim objections, Plaintiff's unjust enrichment claim under 11 U.S.C. § 105(a) (Count 5) is a bankruptcy issue that should remain with this Court. "Section 105(a) empowers the bankruptcy court to exercise its equitable powers" in order to "facilitate the implementation of other Bankruptcy Code provisions," *In re Ludlow Hosp. Soc., Inc.*, 124 F.3d 22, 27 (1st Cir. 1997), and further the Bankruptcy Code's "central objectives," *In re Caesars Ent.*

---

[6]    *See also In re Bencharsky*, 2010 WL 309145, at *1 (Bankr. N.D. Cal. Jan. 19, 2010) (declining to compel arbitration of claim objection, noting that "[t]he proof of claim changes everything"); *In re Yarbrough*, 2010 WL 3885046, at *5 (Bankr. M.D. Ala. Sept. 29, 2010) (same, noting that "[a]n objection to a proof of claim only exists because of the Bankruptcy Code" and the "strong policy interest in keeping matters involving the Debtor, particularly issues regarding creditor claims, 'in one centralized and specialized forum.'")); *In re Russell*, 402 B.R. 188, 193–95 (Bankr. N.D. Miss. 2009) (declining to compel arbitration, noting that claim objection "arise[s] only in the context of bankruptcy" and "[c]entralized resolution of these bankruptcy issues and the Court's power to ensure obedience to its own orders weigh in favor of denying enforcement of the Arbitration Agreement.").

*Operating Co., Inc.*, 808 F.3d 1186, 1188–89 (7th Cir. 2015). This grant of authority and discretion is unique to the Bankruptcy Court, and not applicable to arbitral or any other forums. Moreover, Plaintiff's section 105 unjust enrichment claim is pled in the alternative to its Bankruptcy Code claims that are indisputably before this Court. If this Court were to compel arbitration of the former and for some reason dismiss the latter, the result would be to deprive this Court of its discretion to provide an equitable remedy that ensures that Defendants are not unjustly enriched by the Transactions.

Plaintiff's claims for unjust enrichment, breach of contract, and breach of fiduciary duties also fall within the ambit of the Bankruptcy Court's jurisdiction because they arise out of Defendants' *post-petition* conduct—specifically, Scaramucci's and Messing's wrongful disposal of the Purchased Cryptocurrencies. (Compl. ¶¶ 138, 144–45, 149.) As such, arbitration of these claims "risk[s] the arbitrator tread[ing] upon matters that [a]re properly decided by the Bankruptcy Court." *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1023 n.10 (9th Cir. 2012). Courts have held that causes of action arising from post-petition events related to pre-petition contracts are appropriately before the Bankruptcy Court, even where there is an otherwise applicable arbitration provision. *See In re D & B Swine Farms, Inc.*, 430 B.R. 737, 744 (Bankr. E.D.N.C. 2010) (declining to enforce arbitration provision for claim arising out of post-petition breach of pre-petition contract due to "an inherent conflict between arbitration and the underlying purpose of the bankruptcy laws").

Put another way, FTX's contractual consent right to any sale of the Purchased Cryptocurrencies constituted "property of the estate." *See In re Trump Ent. Resorts, Inc.*, 534 B.R. 93, 102 (Bankr. D. Del. 2015) ("Courts have construed property of the estate to include both tangible and intangible property, including rights arising out of ordinary contractual

relationships, and have even gone so far as to find that the expectation of continuity of business relationships qualifies as property of the estate."). Litigation as to the disposition of that property—which occurred when Defendants sold the Purchased Cryptocurrencies without Plaintiff's consent—thus falls squarely within the "unequivocal" and "exclusive" jurisdiction of the Bankruptcy Court. *In re Trib. Co.*, 418 B.R. 116, 125 (Bankr. D. Del. 2009).

Indeed, Defendants' disposal of the Purchased Cryptocurrencies was an exercise of control over Plaintiff's contractual consent right which deprived Plaintiff of its ability to exercise it. Defendants clearly recognized that an unauthorized sale would be a breach of Plaintiff's contractual rights when they sought permission to dispose of the Purchased Cryptocurrencies in November 2022. (Compl. ¶ 100.) This post-petition breach of contract thus also constitutes a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code and the Bankruptcy Court's *Order Enforcing Sections 362, 365(e)(1), 525 and 541 of The Bankruptcy Code* [D.I. 137], enforcement of which is a matter "central to the Bankruptcy Code's main purpose" and which "bankruptcy courts should decide." *In re Grant*, 281 B.R. 721, 725 (Bankr. S.D. Ala. 2000). Allowing an arbitrator authority over this matter "would be like a parent telling a child not to lie to her teacher," and "when she does, letting the child and her teacher go to another relative to determine the child's punishment!" *Id.* As in this analogy, where "[t]he parent's authority is eroded," arbitration would similarly "diminish[]" the power and authority of the Bankruptcy Court, which "cannot and should not be [done]." *Id.*

*Second*, arbitration would also frustrate the Bankruptcy Code's core objective of "protect[ing] creditors and reorganizing debtors from piecemeal litigation," which risks inconsistent results and wastes resources. *Thorpe*, 671 F.3d at 1022. Here, there are two different purportedly applicable arbitration provisions that would result in arbitration in two

different forums.  (Mot. at 17.)  Taking into account the indisputably non-arbitrable claims appropriately brought in this Court, that means that compelling arbitration would result in litigation in three different forums.  As Defendants concede, "the factual underpinnings" of the purportedly arbitrable claims "overlap with" the indisputably non-arbitrable claims, and thus litigation in different forums risks inconsistent findings.  (Mot. at 20); *see Thorpe*, 671 F.3d at 1019 (declining to arbitrate where arbitrable and non-arbitrable claims "overlap[] factually").  For example, Plaintiff alleges that Scaramucci and Messing substantially assisted Bankman-Fried's breaches in connection with the fraudulent SkyBridge Acquisition.  This claim turns on essentially the same facts as Plaintiff's fraudulent transfer claims, which Defendants concede are not subject to arbitration.  Requiring duplicative evaluation of these claims in separate proceedings would therefore be inefficient.  Similarly, adjudication of the claim objections necessitates the evaluation and resolution of Plaintiff's fraud claims under 11 U.S.C. § 502(d), and any arbitrator would need to address the non-arbitrable fraud claims pending before this Court.

*Third*, arbitration would be inconsistent with "[t]he efficient resolution of claims and the conservation of the bankruptcy estate assets," which is another "integral purpose of bankruptcy."  *APF*, 264 B.R. at 364.  As described above, arbitration would result in fragmented litigation in three different forums.  This process would not only be expensive, but protracted, thereby delaying payments to legitimate creditors.  There is simply no reason to frustrate this fundamental goal of the Bankruptcy Code, which "concerns more than the mere private rights of individuals to an arbitration agreement which was the preeminent concern of Congress in passing the FAA."  *Id.*  And with respect to the claim objections specifically, even if Defendants had their claims liquidated at arbitration, they would still be required to return to this Court to receive

payment on their claims.  *See U.S. Wireless Corp.*, 384 B.R. 713, 722 (Bankr. D. Del. 2008).

Defendants therefore would not be prejudiced by litigating in this Court.

      *Fourth*, enforcing the arbitration clauses would also disrupt "equality of

distribution," *APF*, 264 B.R. at 364, and "prejudice the interests of other creditors," *Yellow

Corp.*, 2024 WL 1313308, at *12.  As Judge Walsh held in *APF*, "enforcing the arbitration

clauses here also disrupts equality of distribution, another fundamental bankruptcy policy.  'It is

inequitable since it would give any aggrieved party who could cite to an arbitration clause in its

contract an exalted status over all other creditors.  This would occur even though the other

creditors were not privy to the underlying contract and reaped no benefit from the contractual

bargain.'"  264 B.R. at 364 (quoting *In re FRG*, 115 B.R. 72, 74 (E.D. Pa. June 4, 1990)).

## II.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO STAY THESE PROCEEDINGS.

      Although "[t]he decision to stay or not stay litigation pending arbitration is within

the Court's discretion," *In re Nu Ride Inc.*, 2024 WL 4376130, at *12 n.95 (Bankr. D. Del. Oct.

1, 2024), "[c]ourts ought to be cautious in staying litigation while arbitration is pending, because

staying litigation for that reason may effectively deny the plaintiff its day in court." *Pursuit*, 595

B.R. at 671–72.  Here, a stay of non-arbitrable claims pending any arbitration would not be

appropriate because (i) the resolution of the non-arbitrable claims does not depend on the

outcome of the purportedly arbitrable claims (Counts 5–9 and 12–13); and, (ii) with respect to

the claim objections (Counts 12 and 13), Plaintiff and creditors would be severely prejudiced by

allowing Defendants to arbitrate their Proofs of Claim first while freezing litigation on Plaintiff's

own Bankruptcy Code claims.

A.      **The Resolution of the Non-Arbitrable Claims Would Not Depend on the Outcome of Arbitration of Counts 5 Through 9.**

Defendants try to justify a stay of the non-arbitrable claims by arguing that they involve "overlapping issues" with claims Defendants seek to arbitrate.  (Mot. at 7.)  But a factual interrelationship between arbitrable and non-arbitrable claims is not a sufficient basis to stay non-arbitrable claims.  *See In re Paragon Offshore PLC*, 588 B.R. 735, 761 (Bankr. D. Del. 2018).  More importantly, the claims here are not *interdependent*—even if Defendants prevailed at arbitration of Plaintiff's unjust enrichment, breach of contract, breach of fiduciary duties, and aiding and abetting breach of fiduciary duty claims, it would not simplify issues pertaining to the non-arbitrable claims that would still need to be resolved in this Court.

Plaintiff's fraudulent transfer, property recovery, and disallowance claims (Counts 1–4 and 10–11) are at "the very heart" of Plaintiff's Complaint, and none of those non-arbitrable claims are contingent on the outcome of any arbitration of the purportedly arbitrable unjust enrichment, breach of contract, breach of fiduciary duties, and aiding and abetting breach of fiduciary duty claims.  *See Paragon*, 588 B.R. at 762 (denying motion to stay adversary proceeding pending arbitration where disposition of arbitrable claim would not "materially affect the disposition of the non-arbitrable claims"); *cf. In re Fleming Cos.*, 325 B.R. 687, 695 (Bankr. D. Del. 2005) (granting stay where "claims under the Bankruptcy Code asserted in [the] Complaint are all dependent on the Plaintiff['s] succeeding" on its contract and fiduciary duty claims).  Just because the claims implicate the same transactions—the SkyBridge Acquisition and the SALT Sponsorship—does not mean that the claims are sufficiently interdependent to justify a stay.

If Plaintiff's non-arbitrable claims were as dependent on Counts 5 through 9 as Defendants assert, the outcome of the arbitration of those claims would necessarily determine the

outcome of the non-arbitrable claims.   But that is not the case here.   Whether Defendants

breached the SkyBridge II LLCA, a question that looks to the post-petition conduct of

Defendants, is a completely separate inquiry from whether the transfers at issue were fraudulent,

a question that looks to the pre-petition conduct of the Debtors.   The same holds true if

Defendants prevail in an arbitration of the breach of fiduciary duties and aiding and abetting

breach of fiduciary duty claims.   Even if an arbitrator found that Defendants did not breach their

duties or aid and abet Bankman-Fried's breaches, that would have no bearing on whether the

Debtors were insolvent at the time of the transfers and whether the transfers were made with the

intent to hinder, delay, or defraud creditors.   Similarly, even if Defendants prevailed in an

arbitration of Plaintiff's unjust enrichment claims, Plaintiff's fraudulent transfer, property

recovery, and disallowance claims would be unaffected.   Whether Defendants were unjustly

enriched contemplates the extent to which Defendants obtained value from the transfers to the

loss of the Debtors, whereas the fraudulent transfer, property recovery, and disallowance claims

turn on whether those transfers were fraudulent in the first place.

       The cases that Defendants rely on in arguing for a stay of non-arbitrable claims

involved situations where, unlike here, the arbitrable issues had the potential to materially affect

the disposition of the non-arbitrable claims.   *See, e.g.*, *In re EXDS, Inc.*, 316 B.R. 817, 826

(Bankr. D. Del. 2004) (granting stay of non-arbitrable litigation claims where arbitrable claims

would "contribute to the resolution of the issues raised by the fraudulent conveyance claim"); *In*

*re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 208 (Bankr. S.D.N.Y. 2002) (granting stay of

non-arbitrable fraudulent transfer claims where those claims were "contractual in nature" and

"directly connected to the [arbitrable] contract disputes").   In contrast, though the non-arbitrable

claims and the allegedly arbitrable unjust enrichment and breach claims in Plaintiff's Complaint

arise from the same transactions, arbitration of those allegedly arbitrable claims would not resolve the non-arbitrable claims.  As explained above, even if an arbitrator were to determine that Defendants were not unjustly enriched, did not breach any contract, and did not breach or aid and abet a breach of any fiduciary duty, it could still be the case that the transfers were made with the intent to hinder, delay, or defraud creditors, that the Debtors were insolvent when the transfers were made, and that the Debtors did not receive reasonably equivalent value.  In other words, "there could be actionable claims even if certain actions taken by Defendants comported with" the agreements underlying the arbitrable claims.  *Pursuit*, 595 B.R at 672.  Because the resolution of the claims Defendants seek to arbitrate does not depend on the resolution of the non-arbitrable claims (or vice versa), the claims are not sufficiently interdependent to justify a stay.

     **B.**     **Plaintiff Would Be Severely Prejudiced by a Stay of the Non-Arbitrable Claims Pending Arbitration of the Claim Objections.**

Defendants argue that staying Plaintiff's non-arbitrable claims pending arbitration would "potentially simplify the issues in litigation" because the "factual underpinnings" of the claims are "essentially the same."  (Mot. at 19–20.)  This is demonstrably untrue, but even if it were not, "judicial efficiency alone is not a sufficient reason for a court to 'refuse to exercise its jurisdiction in favor of proceedings in an alternative forum.'"  *Pursuit*, 595 B.R. at 671 (quoting *CTF Hotel Holdings, Inc.* v. *Marriott Int'l., Inc.*, 381 F.3d 131, 139 (3d Cir. 2004)).  "The right to litigate would mean little if the substance of the litigation, when [Plaintiff]'s day in court finally dawns, may be driven by something that may have occurred during arbitration."  *CTF Hotel Holdings*, 381 F.3d at 139.  The likelihood of this prejudice is particularly severe in regard to Plaintiff's claim objections (Counts 12 and 13).

Plaintiff's claim objections respond to Defendants' Proofs of Claim, which allege a list of injuries resulting from fraudulent misrepresentations that Bankman-Fried made to Defendants to induce them to enter into the Transactions. Staying Plaintiff's non-arbitrable Bankruptcy Code claims while allowing arbitration to proceed on the claim objections would give Defendants a first crack at litigating their purported damages arising from the pre-petition conduct of the FTX Insiders. To the extent that the issue of damages, as well as other issues relevant to Plaintiff's non-arbitrable claims, are decided by an arbitrator, "staying [the] litigation . . . [would] effectively den[y Plaintiff's] . . . day in court." *Id.*

## III.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.

After emphasizing how closely Plaintiff's state law claims overlap with its Bankruptcy Code causes of action, Defendants abruptly reverse course, asserting that the allegedly "non-core" state law claims have nothing to do with the Bankruptcy Code causes of action and that this Court therefore cannot exercise "related to" jurisdiction. (Mot. at 21.) Not so. Bankruptcy courts have jurisdiction over four general categories of matters: "cases under title 11, proceedings arising under title 11, proceedings arising in a case under title 11, and proceedings related to a case under title 11." *PennySaver*, 587 B.R. at 48; *see* 28 U.S.C. § 1334(b). As relevant here, the last category, "related to" jurisdiction, vests in bankruptcy courts post-confirmation when there is a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166–67 (3d Cir. 2004).

This Court has "related to" jurisdiction over the state law claims (Counts 6–9), all of which relate to the SkyBridge Acquisition, post-confirmation. These claims are "logically linked to the Debtor's prepetition losses, and entrusted to the Plaintiff via the Plan for the benefit

of creditors." *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 324 (Bankr. D. Del. 2005). The claims for breach of contract (Count 7) and breach of fiduciary duties (Count 8) relate to Scaramucci's and Messing's management of SkyBridge II under the SkyBridge II LLCA, an agreement central to the Proof of Claim filed by SkyBridge II. The claim for aiding and abetting (Count 9) arises from Scaramucci's and Messing's substantial assistance of Bankman-Fried's breach of fiduciary duties in entering into the fraudulent SkyBridge Acquisition, which is at the heart of SkyBridge II's Proofs of Claim and Plaintiff's fraudulent transfer claims (Counts 1–4). Moreover, this Action clearly is "a means of implementing the Plan," because the Plan vests the Trust with the responsibility of pursuing these causes of action. *In re MPC Computs., LLC*, 465 B.R. 384, 393 (Bankr. D. Del. 2012); Plan § 5.17. These facts thus "establish[] that the adversary proceeding bears a close nexus to the Plan and to the administration of the estate." *In re Venoco, LLC*, 596 B.R. 480, 490 (Bankr. D. Del. 2019), *aff'd*, 610 B.R. 239 (D. Del. 2020), *aff'd*, 998 F.3d 94 (3d Cir. 2021).

Defendants' reliance on *Resorts* in arguing against "related to" jurisdiction is misplaced because, unlike in that case, Plaintiff's claims here are not "an accidental happenstance arising first in the operation of the [post-confirmation] Trust." *AstroPower*, 335 B.R. at 324. Nor are they "an independent afterthought of the post-confirmation trustee." *Id.* Indeed, as the court in *Venoco* highlighted, the plaintiff in *Resorts* waited seven years after the plan went into effect, compared to a one-month delay in *Venoco*. 596 B.R. at 490. Plaintiff filed this proceeding two months *before* the Plan went into effect.

Defendants' criticism of the jurisdiction reservation provision in the Plan is likewise misguided. Section 12.1(f) of the Plan provides that the Court retains jurisdiction to "[a]djudicate, decide or resolve any motions, adversary proceedings, contested or litigated

-24-

matters, and any other matters and Causes of Action." Plan § 12.1(f). In turn, a "Cause of Action" is defined in the Plan as "any action, claim, cause of action, controversy . . . of any kind or character whatsoever . . . whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including without limitation . . . any Avoidance Action . . . [and] any claim against Persons or Entities that are not released under the Plan . . . and such Entity's directors, officers, employees, [or] agents." Plan § 2.1.27. In other words, "[t]he Plan clearly contemplated the maintenance of this action." *MPC Computs.*, 465 B.R. at 393.

Courts have repeatedly held that where, as here, the court possesses subject matter jurisdiction under the *Resorts* test, broadly worded reservations of jurisdiction like the one in the Plan here will be given effect. For example, in *MPC Computers*, the court gave effect to a plan provision retaining jurisdiction over "[a]ll Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets of the Liquidating Trust, as successor-in-interest to the Debtors and property of the Estates . . . and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or this Plan." 465 B.R. at 393 (alteration in original); *see also In re Weiand Auto. Indus.*, 612 B.R. 824, 856–57 (Bankr. D. Del. 2020) (giving effect to similarly broad jurisdiction reservation provision).

Defendants' cited cases do not support—and in fact undermine—Defendants' own argument. A retention of jurisdiction provision that identifies a specific defendant or cause of action *can* satisfy the "close nexus" requirement under *Resorts*. *In re AmCad Holdings, LLC*, 2016 WL 3412289, at *2 (Bankr. D. Del. June 14, 2016); *In re BWI Liquidating Corp.*, 437 B.R. 160, 165 (Bankr. D. Del. 2010). But such a specific identification is not required—rather, the

Third Circuit has clearly held that "if there is jurisdiction, *we will give effect to retention of jurisdiction provisions*." *Resorts*, 372 F.3d at 161 (emphasis added).

## IV. DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) SHOULD BE DENIED IN ITS ENTIRETY.

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016). The complaint need only "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *In re Our Alchemy, LLC*, 642 B.R. 155, 161 (Bankr. D. Del. 2022) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

### A. Plaintiff Has Adequately Pled Claims for Actual Fraudulent Transfer.

Counts 1 and 2 seek to avoid transfers made to Defendants in connection with the SALT Sponsorship, SCF Investment, and SkyBridge Acquisition under 11 U.S.C. § 548(a)(1)(A) and § 554(b) and Del. Code Ann. tit. 6, § 1304(a)(1), which allow for the avoidance of transfers made "with actual intent to hinder, delay, or defraud" creditors. "[A] showing of any one of the three requisite states of mind—the intent to hinder, the intent to delay, or the intent to defraud— is sufficient." *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *4 (Bankr. D. Del. Feb. 8, 2016). The FTX Insiders' intent is imputed to Plaintiff. *Id.* at *6.

Moreover, fraudulent intent may be pled generally. *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019). The heightened pleading standard of Rule 9(b) applies only to the circumstances of the alleged fraud, *id.*, which is met where the complaint includes allegations "regarding the date, time, and amount" of each fraudulent transfer, *Syntax-Brillian*, 2016 WL 1165634, at *6 n.11.

-26-

Because a debtor will "rarely admit" an intent to hinder, delay, or defraud creditors, "courts must usually infer it." *In re Mallinckrodt PLC*, 2024 WL 206682, at *24 (Bankr. D. Del. Jan. 18, 2024) (quoting *MSKP Oak Grove, LLC* v. *Venuto*, 839 Fed. Appx. 708, 712 (3d Cir. 2020)). An inference of actual intent is based on the "totality of the circumstances," drawing "all reasonable inferences" in favor of the plaintiff. *Syntax-Brillian*, 2016 WL 1165634, at *6. Consistent with the principle that every person is "presumed to intend the natural consequences of their acts," allegations demonstrating that the FTX Insiders "should have seen" the effect on creditors in making the transfers are sufficient. *Id.* The relevant question is whether "it is reasonable to conclude that the hindrance [or delay or defrauding] of Debtors' creditors was substantially certain to occur following the [transaction], considering the totality of the circumstances." *Mallinckrodt PLC*, 2024 WL 206682, at *33.

## 1. The Transactions Were Part and Parcel of the FTX Insiders' Fraudulent Scheme.

Defendants concede that "[t]ransfers made in furtherance of a larger scheme to defraud may support an inference of fraudulent intent," but argue that the Complaint "does not include any direct evidence linking Plaintiff['s] decisions to enter into the SkyBridge Transactions with the FTX Insider's fraud." (Mot. at 46 (citation omitted).).[7] As an initial matter, it is well settled that direct evidence of actual fraudulent intent is not required. *See Millennium Lab Holdings II*, 2019 WL 1005657, at *3 ("Actual intent to defraud is usually not susceptible to direct evidence; courts therefore may rely on circumstantial evidence to infer such intent," including "factors other than badges of fraud"). Moreover, there can be no doubt that

---

[7]    Defendants' claim that the SkyBridge Transactions were unconnected with the FTX Insiders' fraud contradicts the concession that Defendant SkyBridge II made in its Proof of Claim against the FTX Group that Defendants had "partnered with a 'house of cards' built 'on a foundation of deception'." (Proof of Claim No. 4697 ¶ 1.)

"the allegations of the [C]omplaint connect the specific transfers to the scheme." (Mot. at 46 (quoting *Alameda Research Ltd.* v. *Giles*, 2024 WL 4562675, at *9 (Bankr. D. Del. Oct. 23, 2024).) For example, the Complaint alleges that:

- "The FTX Insiders used [the FTX Group's] deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive fraud." (Compl. ¶ 49.) Gary Wang admitted in his guilty plea that "he made 'certain changes to [the FTX.com] code'" to "allow Alameda unfettered use of assets on the FTX.com exchange." (Compl. ¶ 51.) "The FTX Insiders were aware at all relevant times" that "Alameda was 'borrowing' (i.e., looting) billions of dollars from FTX.com." (Compl. ¶ 54.) "[T]he FTX Insiders used these Alameda funds and privileges" to "fund acquisitions and venture investments—including the SkyBridge Acquisition." (Compl. ¶ 57.) "It is undisputable that the SkyBridge Acquisition was paid for using FTX Group funds." (Compl. ¶ 109.)

- At the same time, Alameda was "borrow[ing] 'as much money as [it] could [get] from whatever sources [it] could find at whatever terms [it] could get.'" (Compl. ¶ 56.) "When third-party lenders sought repayment of open term loans, Alameda would repay them—often using commingled and misappropriated funds obtained through its 'unlimited line of credit'—so as to continue to project a façade of financial strength and solvency and prevent lenders from taking legal action that might cause the fraud to come to light." (Compl. ¶ 56.)

- Caroline Ellison admitted in her guilty plea that the FTX Insiders agreed "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement." (Compl. ¶ 53.)

- "Throughout 2022, the massive fraud Samuel Bankman-Fried and others were perpetrating came under severe pressure. Both external market forces and Bankman-Fried's own profligate spending were making it increasingly hard to meet cash flow needs at the FTX Group of companies." (Compl. ¶ 6.) "As the financial situation at the FTX Group eroded, Bankman-Fried attempted to capitalize on his newfound celebrity by working his new connections for potential sources of equity investment in FTX to fill the hole in the balance sheet and, therefore, keep his scheme afloat." (Compl. ¶ 7.)

- Bankman-Fried "sought connections that could bring in new investors to bail him out and allow him to cover up his misappropriations. Scaramucci, with his rich and influential connections, was exactly the connection Bankman-Fried needed to access outside money. Bankman-Fried leaned heavily on the new partnership to attempt to raise equity investment in the FTX Group to fill the hole he had created in the balance sheet by misappropriating assets." (Compl. ¶ 15.)

- "In January of 2022, Bankman-Fried formalized his relationship with Scaramucci with an agreement to sponsor Scaramucci's series of SALT conferences," which "came with a price tag of $12 million of Debtor funds, but Bankman-Fried believed it would give him privileged access to a new platform where he would be able to build new connections with financial power players." (Compl. ¶ 10.)

- "In March of 2022, Bankman-Fried deepened the FTX Group's ties with Scaramucci by directing Alameda Research Ventures to make a $10 million investment in [the SkyBridge Coin Fund]." (Compl. ¶ 11.) "FTX Group employees immediately flagged that the proposed SCF Investment did not make economic sense" but also noted that "Anthony is an awesome friend of the firm, think we should support him." (Compl. ¶ 67.) "Bankman-Fried approved the investment with a mere 'sounds reasonable!'" (Compl. ¶ 67.)

- "By the summer of 2022, due to a general downturn in the cryptocurrency industry, it became increasingly challenging to sustain the fraud at the FTX Group." (Compl. ¶ 12.) "The FTX Group's lenders started demanding repayment of their open term loans. Bankman-Fried knew he would need significant amounts of new outside money in order to keep his fraud from coming to light." (Compl. ¶ 12.)

- "[F]rom July 2022 through at least October 2022, [Ellison] agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders." (Compl. ¶ 108.)

- "[B]y September 1, 2022, Alameda Research Ltd. was 'borrowing' *$13.7 billion* from FTX that it had no meaningful ability to repay." (Compl. ¶ 13.)

- "On September 7, 2022, Nishad Singh desperately pled with Bankman-Fried to cut back on expenses in an attempt to rectify the situation; that same day, the SkyBridge Acquisition closed." (Compl. ¶ 107.)

- "No meaningful due diligence was conducted prior to the SkyBridge Acquisition—the deal was proposed over a lunch in the Bahamas and finalized at an Andrea Bocelli concert in Italy a few weeks later. The transaction made no economic sense from FTX's perspective." (Compl. ¶ 13.) "Bankman-Fried agreed to highly unfavorable terms in the SkyBridge Acquisition, all in an increasingly desperate attempt to locate potential sources of funds to fill the hole in the balance sheet that he had created." (Compl. ¶ 72.)

- "In pursuing these transactions, Bankman-Fried cavalierly agreed to make multi-million-dollar investments using FTX Group assets, with no due diligence, and accepted terms that ensured little to no benefit to the FTX Group, its customers, and its creditors." "As a consequence, Plaintiffs got far less than fair value for what they paid, all because Bankman-Fried wanted to perpetuate his fraudulent scheme." (Compl. ¶ 88.)

-29-

- "The transfers were part of a scheme to enrich and otherwise benefit the FTX Insiders by providing connections to additional funding to prevent the collapse of their fraud, which would enable them to continue misappropriating assets of the FTX Group, including by overpaying their close associates Scaramucci and Messing, whom they perceived to have unique access to potential sources of new funding." (Compl. ¶ 111.)

The Complaint thus adequately pleads that the Transactions were part of the FTX Insiders' larger fraudulent scheme in at least three independently sufficient ways.

*First*, the Transactions were "accomplished by and [were] the product of a deliberate fraud," and thus "any disposition of those funds must be considered to be part of a continuing course of conduct which was intended to defraud." *In re Bell & Beckwith*, 64 B.R. 620, 629 (Bankr. N.D. Ohio 1986). As shown above, the funds used for the Transactions were only available as a result of the FTX Insiders' misappropriation of customer assets and fraudulent representations to lenders. Thus, the disposition of these misappropriated and fraudulently obtained funds was part of the FTX Insiders' continuing fraud on their creditors. *See Bell & Beckwith*, 64 B.R. at 620 ("A general scheme or course of conduct that is designed to divert assets of a debtor without regard to the interests of creditors can constitute conduct from which intent to defraud can be found.").

Defendants argue that although "Plaintiff[] allege[s] that the FTX Insiders used misappropriated FTX customer funds and special privileges to fund [the Transactions]," "such allegations fall short of rendering either transaction avoidable." (Mot. at 48.) But neither case cited by Defendants supports this proposition. The first, *In re Sharp Int'l Corp.*, 403 F.3d 43 (2nd Cir. 2005), "deals exclusively with provisions of New York's [Debtor and Creditor Law]," rather than the Bankruptcy Code, and has been essentially confined to its facts. *In re Bayou Grp., LLC*, 439 B.R. 284, 301 (S.D.N.Y. 2010) (*Sharp* "turns on a straightforward pleading

-30-

issue"); *see also In re DBSI, Inc.*, 477 B.R. 504, 511 (Bankr. D. Del. 2012) ("In *Sharp*, there was no allegation that the lender was a part of the fraud; in contrast, here Trustee has alleged that Movants were instrumentalities of the [fraudulent] scheme.").  Defendants next cite *Giles*, which noted that the plaintiffs' theory of fraudulent intent "might very well be sufficient at this stage of the case to support a finding of actual intent," but concluded that it was "not supported by the facts alleged in the [Initial] Complaints."  2024 WL 4562675, at *8.  The court subsequently granted plaintiffs' motion to amend the complaint in that action, and renewed motions to dismiss solely on the issue of actual fraudulent intent are currently pending before the court.  [*See* Adv. Pro. No. 23-50380, D.I. 368, 379.]

> *Second*, as also demonstrated above, the transfers made in connection with the Transactions were intended "to continue perpetuating the fraud." *In re Live Well Fin., Inc.*, 652 B.R. 699, 706 (Bankr. D. Del. 2023).  Specifically, the Transactions were entered into to foster the relationship with Scaramucci in order to gain "privileged access" to his connections and his "Rolodex," and in turn, to "locate potential sources of funds to fill the hole in [FTX's] balance sheet," "which would enable [the FTX Insiders] to continue misappropriating assets of the FTX Group." (Compl. ¶¶ 10, 72, 89, 111.)  The FTX Insiders thus acted with actual fraudulent intent. *See Bayou Grp.*, 439 B.R. at 302 (finding actual fraudulent intent where transfers were made "to lure new investors"); *Syntax-Brillian*, 2016 WL 1165634, at *5 (fraudulent intent sufficiently pled where obligations were "incurred to prolong the [insiders'] fraudulent scheme and to continue an unsustainable enterprise that was inevitably doomed to fail").

> Defendants argue that the Transactions could not have been entered into with actual intent to hinder, delay, or defraud creditors because they "had legitimate business

purposes." (Mot. at 46.)[8]  This argument is contrary to both the well-pled allegations in the Complaint and governing law.  The Complaint alleges that it "made no economic sense" for the FTX Group to enter into the Transactions, and that they had no purpose other than to perpetuate the FTX Insiders' fraudulent scheme.  (Compl. ¶¶ 11, 13, 88.)  But regardless, it is not necessary to plead that the Transactions served *no* purpose other than to hinder, delay, or defraud creditors. *See In re Maxus Energy Corp.*, 641 B.R. 467, 529 (Bankr. D. Del. 2022) ("[E]ven if YPF had a legitimate business purpose or purposes for the transfers, the undertaking of which was not to defraud, hinder, or delay [] creditors, courts have found that mixed intents are sufficient to find actual intent to defraud, hinder, or delay.").

Defendants also argue that "[e]ven assuming . . . that Scaramucci only introduced Bankman-Fried to potential investors because of the SkyBridge Acquisition, Plaintiffs do not cite any facts showing that any such investors actually made an investment in the FTX Group let alone were defrauded as a result of those introductions." (Mot. at 47.)  But Plaintiff need not allege that these potential investors (or any investors, for that matter) were defrauded as a result of the Transactions in order to plead fraudulent intent, so long as the FTX Insiders effected those transfers with the intent to further their fraudulent scheme.  The Complaint alleges that the FTX Insiders entered into the Transactions in an effort to gain access to Defendants' network of potential investors with the hopes that such investors would provide the FTX Group with the capital necessary for the FTX Insiders to continue their fraudulent scheme without detection.

---

[8]    Defendants similarly argue that "Plaintiffs' request to double their equity stake" in SkyBridge from 15% to 30% "demonstrates that the purpose of the SkyBridge Acquisition was not to perpetuate a fraud but to generate legitimate business profits for Plaintiffs." (Mot. at 48.) That the FTX Insiders engaged in bare bones negotiations that took them from a truly horrible deal to a still very bad deal demonstrates nothing of the sort—especially because Defendants concede that FTX was merely maintaining a "veneer of legitimacy" at this time. (Proof of Claim No. 4697 ¶ 1.)

(Compl. ¶ 7.)  The FTX Insiders thus entered into the Transactions with the requisite intent—regardless of whether the Transactions ultimately achieved their intended result.

*Third*, the FTX Insiders' fraudulent intent should also be presumed.  Actual fraudulent intent is presumed where, as here, (i) "the debtor runs a Ponzi scheme or a similar illegitimate enterprise," *Bayou Grp.*, 439 B.R. at 305, and (ii) "the transfers at issue were related to or in furtherance of the fraudulent scheme," *Zazzali* v. *AFA Fin. Grp., LLC*, 2012 WL 4903593, at *7 (Bankr. D. Del. Aug. 28, 2012).  This presumption is based in the principle that "[a] Ponzi scheme cannot work forever," and thus the perpetrator "must know all along, from the very nature of his activities, that investors at the end of the line will lose their money."  *In re Indep. Clearing House*, 77 B.R. 843, 860 (D. Utah 1987).

With respect to the first factor, a Ponzi-like arrangement has been found to exist where "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors" is alleged, *In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988), even where the fraudulent enterprise does not reflect all the "typical" hallmarks of a Ponzi scheme (*e.g.*, artificially high dividends, no legitimate business activity), *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007).  For instance, the court in *In re DBSI, Inc.* applied the Ponzi presumption based on allegations that insiders "directed that investor funds be used to meet pre-existing obligations and operating expenses by evading restrictions governing the use of investor funds."  2011 WL 1810632, at *1 (Bankr. D. Del. May 5, 2011) (rejecting argument that "existence of a Ponzi scheme must be an established fact before the presumption can be made").[9]  Here, the Complaint adequately alleges a Ponzi-like scheme that by its very nature

---

[9]      *See also Live Well*, 652 B.R. at 706 (fraudulent intent sufficiently pled where complaint alleged that debtor's "bond trading business had turned into a de facto Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims"); *In re Nat'l Audit Def.*

would defraud creditors.  *Indep. Clearing House*, 77 B.R. at 860.  Specifically, Plaintiff has

alleged that the FTX Group was unable to fill the massive hole in its balance sheet, and regularly

used customer funds or money from third-party lenders to repay pre-existing debts.  (Compl.

¶¶ 12, 13, 56.)

Additionally, transfers made "for the purpose of attracting new investors to the

scheme" satisfy the requirement that the transfers at issue be related to or in furtherance of the

larger fraud.  *DBSI, Inc.*, 477 B.R. at 512.  Here, the payments to Defendants in connection with

the Transactions were made in an effort to find new investors to fill the hole in FTX Group's

balance sheet and thereby continue the fraudulent scheme.  (Compl. ¶¶ 15, 72.)  As such, they

were made in furtherance of the fraudulent scheme.

### 2. Plaintiff Has Pled Badges of Fraud That Further Support an Inference of Fraudulent Intent.

Plaintiff has also pled at least four of the traditional badges of fraud that courts

have found to be indicative of actual fraudulent intent.  Although the presence of traditional

badges of fraud is not necessary for a court to infer actual intent to hinder, delay, or defraud

creditors, *Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3, "the confluence of

several [badges] in one transaction generally provides conclusive evidence of an intent to

defraud," *In re Live Well Fin., Inc.*, 2023 WL 3995900, at *15 (Bankr. D. Del. June 13, 2023).

---

*Network*, 367 B.R. 207, 222 (Bankr. D. Nev. 2007) (insiders acted with fraudulent intent where they operated scheme that, while "technically not a Ponzi scheme," was "in many respects worse"—"[r]ather than passing on the new funds to old investors, [insiders] took or directed most of this money to themselves . . . or to the perpetuation of the scam"); *In re Carrozzella & Richardson*, 237 B.R. 536, 539 (Bankr. D. Conn. 1999) (recognizing existence of "Ponzi-like scheme" where "funds placed with a debtor by later depositors are secretly and illicitly utilized to pay returns, and repay principal, to earlier depositor").

*First*, Plaintiff has adequately pled "a close relationship among the parties to the transaction," which is a well-recognized "badge[] of fraud." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 465 (Bankr. D. Del. 2017). Specifically, the Complaint alleges that employees of the FTX Group viewed Scaramucci as "an awesome friend of the firm[]," which appears to have motivated the Transactions despite their lack of "economic sense." (Compl. ¶ 67.) Moreover, the Complaint alleges that Bankman-Fried and Scaramucci met socially, including on vacation in the Bahamas (Compl. ¶ 71); that Scaramucci arranged meetings between Bankman-Fried and "Wall Street financial power brokers," "high-profile celebrities," and politicians in the Middle East (Compl. ¶¶ 9, 91–93) and was so invested in Bankman-Fried impressing these potential investors that he lent Bankman-Fried his own clothes to wear to those meetings (Compl. ¶ 95); and that Scaramucci also had a personal relationship with Bankman-Fried's father, Joseph Bankman—so much so that when Scaramucci received a call from Bankman asking for "rescue funding," Scaramucci immediately flew down to the Bahamas on a private jet to try to meet with Bankman-Fried. (Compl. ¶ 96.)

*Second*, as explained further below, Plaintiff has adequately pled that Debtors were insolvent at the time of the Transactions. *See infra* Section IV.B.1; *see also Live Well*, 2023 WL 3995900, at *15 (finding debtor's "insolven[cy] at the time the obligations were incurred" constituted a "badge of fraud"). These "factual allegations, taken as true, provide enough detail of insolvency upon which to base the avoidance claims." *In re Direct Response Media Inc.*, 466 B.R. 626, 655–56 (Bankr. D. Del. 2012); *see also In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019) ("Insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss.").

*Third*, as explained further below (*see infra* Section IV.B.2), Plaintiff has adequately pled that the FTX Group did not receive reasonably equivalent value in exchange for the $50+ million in transfers to Defendants. *See Live Well*, 2023 WL 3995900, at *15 (finding debtor's receipt of "less than reasonably equivalent value" constituted a "badge of fraud").

*Fourth*, Plaintiff has also adequately alleged that the Transactions resulted in a "hasty transfer not in the usual course of business." *DSI Renal Holdings*, 574 B.R. at 465. For example, the $10 million SCF Investment was approved by Bankman-Fried *within a day* of Scaramucci's request, even after the head of FTX Ventures Ltd. raised serious concerns about the economics of the transaction. (Compl. ¶ 67.) The SkyBridge Acquisition was likewise executed with "[n]o meaningful due diligence" only a few weeks after Scaramucci's initial meeting with Bankman-Fried in the Bahamas. (Compl. ¶ 13.)

### 3. The FTX Insiders Acted with Intent to Hinder, Delay, or Defraud Creditors by Putting Millions of Dollars Beyond Their Reach.

Regardless of the larger fraudulent scheme, the FTX Insiders acted with the requisite intent because they knew the Transactions did not make economic sense (Compl. ¶¶ 11, 13, 88), but nonetheless entered into them, putting creditor funds beyond their reach. *See Bell & Beckwith*, 64 B.R. at 629 (debtor's "use of the customer funds for his own purposes was an unlawful theft"). In entering into the Transactions using funds that were misappropriated from FTX creditors at a time when the FTX Group was deeply insolvent and actively misrepresenting its true financial position to creditors, the FTX Insiders "knowingly expose[d]" those creditors "to a substantial risk of loss of which they were unaware." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 668 (7th Cir. 2013) (While Sentinel's "primary purpose may not have been to render the funds permanently unavailable" to its clients, Sentinel "should have seen this result as a natural consequence of its actions," and thus acted with "actual intent to hinder, delay, or

defraud"); *see Syntax-Brillian*, 2016 WL 1165634, at *6 ("The delay of payment to creditors was substantially certain to occur when the Debtors incurred the Obligations at a time when they were purposefully concealing massive losses."). As such, they acted with intent to hinder, delay, or defraud the creditors whose assets were used to fund the Transactions.

Even if the FTX Insiders did not know that the funds used for the Transactions would become permanently unavailable to repay creditors, they at least knew that the Transactions would hinder or delay repayment to FTX Group creditors. Put another way, under the totality of the circumstances, "the natural consequence" of these transfers "would, at a minimum, delay or hinder distributions to the creditor body." *Syntax-Brillian*, 2016 WL 1165634, at *6. The FTX Insiders acknowledged as much (Compl. ¶ 55), but nonetheless proceeded with the Transactions. *See ASARCO LLC* v. *Ams. Mining Corp.*, 396 B.R. 278, 388 (S.D. Tex. 2008) (finding intent to hinder or delay where insider "knew that payments to some creditors would be hindered and delayed as a result of the transaction, but it closed the transaction anyway"). Indeed, the transfers necessarily hindered and delayed payment to creditors because assets that should have been instantly available to creditors were put even further beyond their reach. *See, e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 249 (Bankr. S.D.N.Y. 2013) (transferors had "intent to 'hinder and delay'" creditors "when they transferred out and then spun off the oil and gas assets," which left debtors "insolvent and undercapitalized," and which "was not made for reasonably equivalent value").

### B.    Plaintiff Has Adequately Pled Claims for Constructive Fraudulent Transfer.

Plaintiff has adequately pled constructive fraudulent transfer under the Bankruptcy Code and Delaware law. The Complaint plainly alleges that the FTX Group was insolvent at the time of the relevant transfers and that the FTX Group did not receive reasonably equivalent value in return for its transfers to Defendants.

**1.  The FTX Group Was Insolvent at the Time of the Transfers.**

As an initial matter, "[i]nsolvency is a factual inquiry that often evades determination at the motion to dismiss stage." *In re FAH Liquidating Corp.*, 572 B.R. 117, 128 (Bankr. D. Del. 2017).  In *Giles*, the Court found that the following allegations regarding insolvency were sufficient to defeat a motion to dismiss:

> The other FTX Group entities involved in the acquisition of Embed were also insolvent at all relevant times.  As Singh admitted in his guilty plea, by "early September 2022," the same month the Embed acquisition closed, Alameda "could not repay what it owed."  *See* Plea Tr. 29:2–3, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102.

> Ellison made similar admissions in her guilty plea, stating that: (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds.

2024 WL 4562675, at *12 n.32.  The instant Complaint contains nearly identical allegations. (*See* Compl. ¶¶ 107–08.)

Additionally, as Defendants concede, this Court has already held that the Debtors are substantively consolidated for purposes of any insolvency analysis.  (Mot. at 43 (citing *Giles*, 2024 WL 4562675, at *12 n.32).)  Defendants nevertheless ask the Court to revisit that decision, arguing that "[s]ubstantive consolidation does not have *nunc pro tunc* effect unless the order specifically says so." (Mot. at 43.)  But this argument is misguided—the Court indisputably has the power to interpret and enforce its own orders.  *Travelers Indem. Co.* v. *Bailey*, 557 U.S. 137, 151 (2009).  This Court did just that when it decided in *Giles* that, post-confirmation, insolvency is a consolidated inquiry, at least at the motion to dismiss stage.  2024 WL 4562675, at *12 n.32.

Moreover, courts have held that where, as here, the Debtors' assets were so inextricably commingled at the time of the relevant transfers, substantive consolidation for

purposes of examining insolvency is appropriate.  *See In re Empire Land, LLC*, 2016 WL 1391297, at *10 (Bankr. C.D. Cal. Apr. 4, 2016).  In contrast, none of Defendants' cases arguing against substantive consolidation are even about insolvency.  *See In re Sunset Aviation, Inc.*, 468 B.R. 641, 646 (Bankr. D. Del. 2011) (concerning effect of substantive consolidation when pre-consolidated debtors had different petition dates, impacting length of preference period); *In re Garden Ridge Corp.*, 338 B.R. 627, 640–41 (Bankr. D. Del. 2006) (concerning effect of substantive consolidation on mutuality of obligations).

### 2.    FTX Did Not Receive Reasonably Equivalent Value in the Transactions.

Plaintiff has likewise pled sufficient facts to allege that the Debtors did not receive reasonably equivalent value in exchange for any of the transfers at issue.  As a threshold matter, Plaintiff's allegations need only establish that it was "facially plausible that there was not reasonably equivalent value" exchanged in the Transactions.  *In re Aphton Corp.*, 423 B.R. 76, 93 (Bankr. D. Del. 2010).  Defendants' argument about the purported present valuation of SkyBridge II (at 40–41) is therefore premature, because assessing "'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss."  *In re Qimonda Richmond, LLC*, 467 B.R. 318, 327 (Bankr. D. Del. 2012); *see In re Charys Holding Co.*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("[R]easonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

Regardless, Plaintiff has plausibly alleged that the Debtors did not receive reasonably equivalent value in any of the Transactions.  "[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"  *Charys*, 443 B.R. at 637 (quoting *VFB LLC* v. *Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)).  In determining whether a debtor received reasonably equivalent value for its investment, courts

look to the "'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." *In re Freuhauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (quoting *In re R.M.L., Inc.*, 92 F.3d 139, 148–49, 153 (3d Cir. 1996)). The court must "examine all aspects of the transaction to measure carefully the value of the benefits received by the [debtor]." *In re BCF Mgmt., Inc.*, 320 B.R. 265, 280 (Bankr. D. Del. 2005).

"[I]n determining whether a value is objectively 'reasonable,' the court gives significant deference to marketplace values." *Peltz* v. *Hatten*, 279 B.R. 710, 738 (D. Del. 2002); *BFP* v. *Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994) (bankruptcy courts can "refer to the traditional common-law notion of fair market value as the benchmark" when determining whether reasonably equivalent value was received). The Third Circuit has held that courts "must determine the net effect of the transaction on the debtor and that if the debtor's 'realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.'" *In re EBC I, Inc.*, 380 B.R. 348, 362 (Bankr. D. Del. 2008) (quoting *Mellon Bank, N.A.* v. *Metro Commnc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), *as amended* (Oct. 28, 1991)). As set forth below, the facts alleged in Plaintiff's Complaint show that, at the time the Transactions were entered into, the investments were not worth anything close to what the Debtors agreed to pay for them.

### a.    The SALT Sponsorship and the SCF Investment

In January 2022, FTX and SALT executed a Sponsorship Agreement whereby FTX agreed to pay $12 million to sponsor conferences and podcast episodes organized by SALT between 2022 and 2024. (Compl. ¶ 4.) Like the other Transactions, the SALT Sponsorship was entered into with a goal of "further develop[ing] the FTX Group's relationship with

Scaramucci." (Compl. ¶ 65.) The Complaint alleges that Bankman-Fried entered into the SALT Sponsorship Agreement because he "believed it would give him privileged access to a new platform where he would be able to build new connections with financial power players." (Compl. ¶ 10.) To facilitate this access, FTX transferred a total of $2 million to SALT prior to the Petition Date. (Compl. ¶ 66.)

Just a few months later, in or around March 2022, Alameda Research Ventures invested $10 million in the SkyBridge Coin Fund. (Compl. ¶ 11.) Even before the investment was made, it was clear that the transaction did not make economic sense. The head of FTX Ventures Ltd. recognized that the SkyBridge Coin Fund did not "have a crypto native GP running this," that the SCF's strategy lacked "nuance[]," and that the SCF was not "distinctly competitive with the other liquid token funds out there who are run by experienced traders." (Compl. ¶ 67.) The only consideration underlying the decision to invest in the SCF was that "Anthony [Scaramucci] [wa]s an awesome friend of the [FTX Group]." (Compl. ¶ 67.) No economic analysis or due diligence regarding the economic viability of the SCF Investment was conducted; rather, Bankman-Fried approved the investment with a mere "sounds reasonable!" within 24 hours of when Scaramucci requested that FTX make the investment. (Compl. ¶ 67.) When viewed in their totality, it is clear that no "arm's-length relationship" was present here. *Aphton Corp.*, 423 B.R. at 89.

Defendants attempt to sidestep these allegations by making a factual argument that the FTX Group gained value because the SALT Sponsorship "fit [its] business and target audience as it gave it access to conferences for asset managers." (Mot. at 41.) But when a party receives such purported "indirect benefits" as part of a fraudulent transfer, those benefits must be "measured and then compared to the obligations that the bankrupt incurred." *In re FBI Wind*

-41-

*Down, Inc.*, 581 B.R. 387, 415 (Bankr. D. Del. 2018).  Any determination of that indirect value

is a fact-specific inquiry not appropriate for resolution at the motion to dismiss stage.  *Qimonda*

*Richmond*, 467 B.R. at 327.

### b.      The SkyBridge Acquisition

The SCF Investment and SALT Sponsorship made it clear to Scaramucci that

Bankman-Fried would transfer large sums of money to Defendants with no consideration of the

potential economic benefit that the FTX Group would receive in return.  When SkyBridge's

assets under management dropped from a high of $9 billion to a mere $2.2 billion in 2022,

Scaramucci knew that he could turn to Bankman-Fried for even more money.  (Compl. ¶ 14.)

And he did just that.  On September 7, 2022, Bankman-Fried, at Scaramucci's request, caused

the FTX Group to pay to Defendants $45 million for 30% membership interests in SkyBridge II

and SkyBridge GP.  (Compl. ¶ 73.)  And at the time of the investment, there was little more to

SkyBridge II and SkyBridge GP than the $45 million that the FTX Group had just put in.

(Compl. ¶ 84.)  That capital contribution represented over ***92%*** of the assets that SkyBridge II

had to its name.  (Compl. ¶ 84.)  $40 million of that contribution was immediately used to

purchase cryptocurrencies that the FTX Group easily could have purchased for itself less

expensively.  (Compl. ¶ 86.)  In essence, Bankman-Fried caused the FTX Group to pay $45

million for a $12 million interest in a basket of cryptocurrencies of its own selection.  This is a

far cry from the requirement that the debtor receive "roughly the value it gave."  *VFB LLC*, 482

F.3d at 631 (quoting *Freuhauf*, 444 F.3d at 213).

In addition to the wide disparity between the dollar values of what the FTX Group

invested and what it received, the terms of the SkyBridge Acquisition further diminished its

value to the FTX Group.  *First*, despite Island Bay's 30% interest in the company, and despite

the fact that Prowes Holding S.A.—a minority member holding a mere 6.993% interest in

SkyBridge II—was guaranteed a seat on the SkyBridge Board of Managers, Island Bay received no representation on the Board.  (Compl. ¶ 82.)  *Second*, the terms of the investment made it "effectively impossible to withdraw any of Island Bay's money without Defendants' sign-off." (Compl. ¶ 87.)  *Third*, and perhaps most striking, the capital contribution Island Bay made in exchange for the 30% interest "immediately represented over 92% of the assets that SkyBridge II had to its name."  (Compl. ¶ 84.)  These allegations are more than sufficient to plead a lack of reasonably equivalent value.

### C.   Plaintiff Has Adequately Pled Unjust Enrichment (Counts 5 and 6).

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Wells Fargo Bank, N.A.* v. *Estate of Malkin*, 278 A.3d 53, 69 (Del. 2022) (quoting *Nemec* v. *Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).   To state a claim for unjust enrichment, a plaintiff must allege: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Garfield ex rel. ODP Corp.* v. *Allen*, 277 A.3d 296, 340–41 (Del. Ch. 2022) (quoting *Nemec*, 991 A.2d at 1130).

In Delaware, the absence of a remedy at law is only required if an unjust enrichment claim is brought in the Court of Chancery and there is no other independent basis for equitable jurisdiction.  *See State ex rel. Jennings* v. *Monsanto Co.*, 299 A.3d 372, 390–91 (Del. 2023); *see also Bandera Master Fund LP* v. *Boardwalk Pipeline Partners, LP*, 2024 WL 4115729, at *48 n.300 (Del. Ch. Sept. 9, 2024) ("[I]t is not necessary under Delaware law for a plaintiff to plead or later prove the absence of an adequate remedy at law for an unjust enrichment claim.").   Plaintiff, therefore, is not required to plead the absence of a remedy provided by law in this Court.  *See Jennings*, 299 A.3d at 390–91; *Metcap Sec. LLC* v. *Pearl*

-43-

*Senior Care, Inc.*, 2009 WL 513756, at *5 n.26 (Del. Ch. Feb. 27, 2009) ("The lack of an adequate remedy at law is not critical to an unjust enrichment claim because some unjust enrichment claims may be heard in the law courts.").

Even if the absence of a remedy at law were required, at the pleading stage, it is "entirely acceptable [for Plaintiff] to pursue alternative theories." *In re Our Alchemy, LLC*, 2019 WL 4447545, at *11 (Bankr. D. Del. Sept. 16, 2019). Defendants argue that Plaintiff has an adequate remedy because the Transactions are governed by contract (at 53), but a plaintiff may plead an alternative unjust enrichment theory even where the pleading contains a contract-based claim. *Our Alchemy*, 2019 WL 4447545, at *11; *FAH Liquidating Corp.*, 572 B.R. at 131. "At least at the pleading stage, Delaware courts have denied motions to dismiss unjust enrichment claims based on the receipt or retention of overpaid or wrongfully obtained consideration under a valid, enforceable agreement." *City of Pittsburgh Comprehensive Mun. Pension Tr. Fund* v. *Conway*, 2024 WL 1752419, at *26 (Del. Ch. Apr. 24, 2024).

Plaintiff has also sufficiently pled the other elements of unjust enrichment. Plaintiff alleges that Defendants have been enriched by both the Transactions and the unauthorized disposal of the Purchased Cryptocurrencies. (Compl. ¶¶ 135, 138.) Defendants raise no objection to the existence of a relationship between their enrichment and Plaintiff's impoverishment as a result of the Transactions. (Compl. ¶¶ 136, 138.) As detailed in the Complaint and explained above (*see supra* Section IV.B.2), Plaintiff was impoverished by the Transactions because they "did not provide and had virtually no prospect of providing Plaintiff[] with reasonably equivalent value." (Compl. ¶¶ 80–87, 136.) Plaintiff was also impoverished by the total *appreciation* in value of the cryptocurrencies that Defendants have apparently disposed of without the Debtors' authorization. (Compl. ¶ 104.)

Defendants' reliance on *Jacobs* v. *Meghji*, 2020 WL 5951410, at *14 (Del. Ch. Oct. 8, 2010), to argue that Plaintiff's unjust enrichment claim should be dismissed because Plaintiff pled no wrongdoing or mistake in connection with the Transactions or the unauthorized disposal of cryptocurrencies is misplaced.   The court in *Jacobs* observed that "an absence of justification . . . *usually* entails some type of wrongdoing or mistake at the time of transfer," but acknowledged that in some situations restitution is permitted "even when the defendant retaining the benefit is not a wrongdoer."  *Id.* at *14–15 (emphasis added).  Moreover, unlike the minority shareholder in *Jacobs*, who obtained its benefit through arm's-length negotiations, and had no knowledge of the majority shareholder's wrongdoing, Defendants induced Bankman-Fried to enter into the Transactions with minimal due diligence and wrongfully disposed of cryptocurrencies without the required authorization.  (Compl. ¶¶ 13, 72, 88, 100.)

> **D.    Plaintiff Has Adequately Pled Breach of Contract Against Scaramucci and Messing (Count 7).**

The Complaint alleges that Scaramucci and Messing breached the SkyBridge II LLCA by causing SkyBridge II to dispose of its BTC, SOL, FTT, and SRM tokens.  (Compl. ¶¶ 19, 140–46.)  Defendants incorrectly contend that Plaintiff fails to state a claim for breach of contract because:  (1) Skybridge II is the proper defendant, not Scaramucci and Messing; (2) the SkyBridge II LLCA exculpates Scaramucci and Messing from liability for any purported breach; and (3) there are no damages.  (Mot. at 23.)

*First*, Defendants argue that Scaramucci and Messing cannot violate Section 3.11 of the SkyBridge II LLCA because it provides that "[t]he *Company* shall not sell . . . or otherwise dispose of any of the Purchased Cryptocurrency . . . without the prior written consent of Island." (Mot. at 24 (quoting SkyBridge II LLCA).)  But Scaramucci and Messing are on the Board of Managers, and therefore may be held liable even though the breached contract provision

involved the company. *CMS Inv. Holdings, LLC* v. *Castle*, 2015 WL 3894021, at *14 (Del. Ch. June 23, 2015) (denying motion to dismiss count for breach of contract against individual board members where the board members allegedly caused breaches committed by the company).

   *Second*, Defendants are wrong that Scaramucci and Messing are exculpated from liability because the SkyBridge II LLCA precludes manager liability for acts taken "in good faith." (Mot. at 25–26.)  Even under Delaware's liberal approach to LLC formation, managers cannot eliminate their own liability for acts taken in bad faith. *See In re HH Liquidation, LLC*, 590 B.R. 211, 272 (Bankr. D. Del. 2018).  For a contract claim to survive a motion to dismiss, a plaintiff "need only allege facts related to the alleged act taken in bad faith, and a plausible motivation for it." *Tygon Peak Cap. Mgmt., LLC* v. *Mobile Invs. Investco, LLC*, 2022 WL 34688, at *22 (Del. Ch. Jan. 4, 2022) (procedural history omitted) (quoting *Clean Harbors, Inc.* v. *Safety-Kleen, Inc.*, 2011 WL 6793718, at *7 (Del. Ch. Dec. 9, 2011)).  This is a "minimal standard" that serves simply to "give the defendant notice of the claim being made against it." *Id.*  By alleging that "Scaramucci and Messing at best grossly mismanaged SkyBridge's assets and, at worst, may have looted the assets for themselves" (Compl. ¶ 103), the Complaint easily clears this low bar. *See Clean Harbors, Inc.*, 2011 WL 6793718, at *7.

   *Finally*, Defendants argue that the Complaint fails to plausibly plead damages for breach of contract because Defendants covered their FTT and SRM losses and have not sold their BTC or SOL. (Mot. at 13 n.11, 24 n.18, 27.)  Even if true, this is a factual argument, which should not be considered on a motion to dismiss. *See Phillips* v. *Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  Plaintiff's allegations regarding SkyBridge II's December 2023 consolidated balance sheet, which appears to reflect a digital asset value far below what it should be had SkyBridge II held the cryptocurrencies as it was required to do (Compl. ¶ 104), are

-46-

sufficient to allege damages for breach of contract at this stage. *See Weyerhaeuser Co.* v. *Domtar Corp.*, 61 F. Supp. 3d 445, 453 (D. Del. 2014), *aff'd*, 721 F. App'x 186 (3d Cir. 2018) (under Delaware law, plaintiff need not allege exact dollar value of damages to satisfy damage pleading requirement).

> **E.    Plaintiff Has Adequately Pled Breach of Fiduciary Duties Against Scaramucci and Messing (Count 8).**

Plaintiff alleges that Scaramucci and Messing breached their fiduciary duties to Island Bay, which they owed as Managers of SkyBridge II, by setting excessive compensation and selling Purchased Cryptocurrencies without Island Bay's consent. (Compl. ¶¶ 148–49.) Defendants incorrectly argue: (1) the claims are derivative, and (2) Plaintiff fails to plausibly allege any breach of fiduciary duties by Messing or Scaramucci. (Mot. at 27.)

*First*, Plaintiff's breach of fiduciary duties claims are not derivative, because managers of a Delaware LLC owe fiduciary duties to the LLC's members directly, just as controlling shareholders have a direct duty to minority shareholders. *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *7 (Del. Ch. Oct. 28, 2010). The SkyBridge II LLCA does not limit or alter this rule. And Plaintiff's predecessor, Island Bay Ventures, was a minority member of SkyBridge II—holding a 30% interest in the LLC but having no board presence and no voting rights. (Compl. ¶¶ 81–82.) Scaramucci and Messing, on the other hand, controlled two out of four seats on SkyBridge II's Board of Managers. (Compl. ¶ 82.) Because Plaintiff can assert these claims directly, Plaintiff need not make a demand on the board, plead demand futility, or verify the complaint.[10]

---

[10]    In any event, Plaintiff clearly pleads facts sufficient to show that demand would have been futile. A member of a Delaware LLC does not need to make a demand of the LLC's managers to bring an action if "an effort to cause those managers or members to bring the action is not likely to succeed." Del. Code Ann. tit. 6, § 18-1001. An LLC member need only plead facts to "create a reasonable doubt that, as of the time the complaint is filed, the board of

Furthermore, Plaintiff's claims are direct against Scaramucci and Messing because Plaintiff has pled a breach of the SkyBridge II LLCA. When a manager "breache[s] the terms of the [company's operating] agreement[,]" claims arising from that breach are direct and not derivative. *Allen* v. *El Paso Pipeline GP Co*., 90 A.3d 1097, 1110 (Del. Ch. 2014); *see also In re Cencom Cable Income Partners, L.P*., 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000) (finding plaintiffs' "claims for breach of fiduciary duty and breach of the partnership agreement are, in substance, direct claims"). Here, Plaintiff has alleged that Defendants breached a provision of the SkyBridge II LLCA that prevented SkyBridge II from disposing of the cryptocurrencies purchased with Plaintiff's capital contributions without Plaintiff's consent. (Compl. ¶ 100.) The sale of these cryptocurrencies breached "a contractual right of shareholders that [was] independent" of the rights of the company. *Manzo* v. *Rite Aid Corp*., 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003). The injury flowing from the breach is to Plaintiff, not SkyBridge II.

*Second*, Plaintiff's allegations as to Messing and Scaramucci's compensation decisions and the disposal of the Purchased Cryptocurrency are not, as Defendants argue (at 31), conclusory. The Complaint alleges that in 2023, for example, SkyBridge II paid out over $22 million in expenses for "Compensation and fringe benefits," while "Management fees" generated revenues of only $20.4 million. (Compl. ¶ 105.) The fact that the Complaint does not specify how much each individual Defendant received in compensation—information to which Plaintiff

---

directors could have properly exercised its independent and disinterested business judgment in responding[.]" *Ishimaru* v. *Fung*, 2005 WL 2899680, at *12 (Del. Ch. Oct. 26, 2005). Here, Plaintiff has alleged that Defendants Scaramucci and Messing controlled the board of SkyBridge II along with two close associates. (Compl. ¶ 82.) These allegations are sufficient to establish that Defendants had "domination or control" of the LLC board such that the board would be incapable of acting independently. *King* v. *VeriFone Holdings, Inc*., 12 A.3d 1140, 1145 n.24 (Del. 2011).

does not yet have access—is not dispositive at the pleading stage.  Rather, when facts are "peculiarly within the defendant's possession," a plaintiff can plead them on information and belief.  *McDermott* v. *Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016).

Defendants also contend that Plaintiff's fiduciary duty claims concerning SkyBridge II's sale of cryptocurrency tokens should be dismissed as duplicative of Plaintiff's breach of contract claim (Count 7).  But this ignores that Plaintiff can plead claims in the alternative.  *In re UD Dissolution Corp.*, 629 B.R. 11, 45 (Bankr. D. Del. 2021).

*Finally*, Scaramucci and Messing are not exculpated from liability for breach of fiduciary duties by the SkyBridge II LLCA.  As discussed *supra* Section IV.D, the LLCA exculpates SkyBridge II's managers only for acts done in good faith.  *See* SkyBridge II LLCA § 3.08(a).  In alleging that Scaramucci and Messing caused SkyBridge II to pay them excessive compensation against declining business performance and to engage in damaging cryptocurrency transactions that were authorized neither by the SkyBridge II LLCA nor by Island Bay (Compl. ¶ 149), Plaintiff has alleged an "intentional and conscious disregard of duty" sufficient to show bad faith.  *See Stein* v. *Blankfein*, 2019 WL 2323790, at *6 (Del. Ch. May 31, 2019).

### F.    Plaintiff Has Adequately Pled Aiding and Abetting Breach of Fiduciary Duty Against Scaramucci and Messing (Count 9).

Under Delaware law, a valid claim for aiding and abetting a breach of fiduciary duty requires:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."  *DSI Renal Holdings*, 574 B.R. at 474.  The Complaint properly pleads each element of its claim against Scaramucci and Messing for aiding and abetting Bankman-Fried's breach of fiduciary duty against Debtor Island Bay (Count 9).

-49-

*First*, the Complaint alleges that "[a]t all relevant times, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing, and oversight—to Island Bay under Delaware law." (Compl. ¶ 153.)  *See In re W.J. Bradley Morgt. Cap., LLC*, 598 B.R. 150, 163 (Bankr. D. Del. 2019) ("Delaware law is clear that officers, directors, and managers owe a company they serve the traditional triad duties of care, loyalty and good faith.").

*Second*, the Complaint clearly alleges that Bankman-Fried breached these duties. Bankman-Fried has been convicted of seven counts of fraud and conspiracy for embezzling billions of dollars of customer deposits from the FTX Group exchanges.  (Compl. ¶ 50.)  That Bankman-Fried breached his fiduciary duties to the FTX Group is thus a matter of public record. Plaintiff alleges that Bankman-Fried caused FTX to "make the SkyBridge Acquisition"—from which Plaintiff had "virtually no prospect of receiving[] reasonably equivalent value"—in order to "personally benefit[.]"  (Compl. ¶ 154.)  The Complaint further alleges that only "bare-bones due diligence" was conducted prior to the SkyBridge Acquisition, resulting in "highly unfavorable terms" for the FTX Group.  (Compl. ¶ 72).  This is sufficient to allege that Bankman-Fried breached *at least* his duty of care.  *In re Sols. Liquidation LLC*, 608 B.R. 384, 398 (Bankr. D. Del. 2019) (explaining that "gross negligence," which constitutes a breach of the duty of care under Delaware law, "may be pled by a complaint alleging that a board undertook a major acquisition without conducting due diligence, [or] without retaining experienced advisors") (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009)).

*Third*, the Complaint also adequately alleges that Scaramucci and Messing "knowingly participated" in Bankman-Fried's breach of fiduciary duty.  Plaintiff must show that Scaramucci and Messing knew that Bankman-Fried "ha[d] fiduciary obligations" and "help[ed] participate in [his] breach of those obligations."  *Ryan* v. *Buckeye Partners, L.P.*, 2022 WL

389827, at *15 (Del. Ch. Feb. 9, 2022), *aff'd*, 285 A.3d 459 (Del. 2022).  Here, the Complaint does just that.  It specifically alleges that "Scaramucci and Messing knew that the SkyBridge Acquisition did not provide and had virtually no prospect of providing Plaintiff[] with reasonably equivalent value, and that Bankman-Fried personally benefited from the SkyBridge Acquisition." (Compl. ¶ 155.)  Scaramucci's involvement in Bankman-Fried's breach was extensive:  it was Scaramucci who proposed the SkyBridge Acquisition to Bankman-Fried, allowed the deal to be hastily negotiated, and, in effect, took advantage of Bankman-Fried's willingness to enter into unfavorable transactions for his own personal gain.

The Complaint further alleges that the SkyBridge Acquisition was not the first time Scaramucci and Messing took advantage of Bankman-Fried's willingness to breach his fiduciary duties, as they had previously done so when they asked Bankman-Fried to invest in the failing SCF.  *See In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 480 (Del. Ch. 2023) ("persistent and opportunistic" actions evidenced aiding and abetting liability).  At the very least, the Complaint adequately pleads that despite their awareness of Bankman-Fried's deviation from his standard of care as a fiduciary, Scaramucci and Messing actively participated in and encouraged the materialization of that deviation into a full-blown breach.  The decision to participate in and encourage Bankman-Fried's breach inflicted harm on Island Bay, and Scaramucci and Messing should be held to account for those actions.

In assessing the knowing participation element of a claim for aiding and abetting breaches of fiduciary duty, Delaware courts also consider "[t]he nature of the relationship between the secondary and primary actors" and "[t]he secondary actor's state of mind."  *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *42 (Del. Ch. Aug. 27, 2015).  Here, both  support  the  conclusion  that  Scaramucci  and  Messing  knowingly  participated  in

-51-

Bankman-Fried's breach.  With respect to the former, the Complaint alleges that Scaramucci and Bankman-Fried had an extremely close relationship, and that Scaramucci was able to take advantage of that relationship by trading his connections for FTX Group cash and presenting the financial condition of SkyBridge as "much rosier" than it actually was.  (Compl. ¶ 71.) Regarding the latter, the Complaint alleges that Scaramucci and Messing were desperate for a bailout of their company—and were willing to enter into a transaction with someone who had a complete disregard for those to which his duties were owed in order to achieve that goal.  (*See* Compl. ¶ 79.)  Scaramucci and Messing knew that the Transactions were a bad deal for the FTX Group and that Bankman-Fried benefited personally.  (Compl. ¶ 155.)  These two factors thus further demonstrate the sufficiency of the Complaint's allegations with respect to this "knowing participation" element.

> *Fourth*, as proximate cause of Bankman-Fried's breach, the estate suffered damages in at least the amount of the Transactions.

### G.   Plaintiff Has Adequately Pled Disallowance of Claims and Property Recovery (Counts 10 and 11).

Because Plaintiff has adequately pled fraudulent transfer claims under sections 554, 547, and 548 of the Bankruptcy Code, Plaintiff has also adequately pled its disallowance claim under section 502(d) and its property recovery claim under section 550(a)(1) (Counts 10–11).  *See Miller* v. *Mott*, 2023 WL 6467368, at \*6 (Bankr. D. Del. Oct. 4, 2023) (declining to dismiss claim under 11 U.S.C. § 550 where claim for fraudulent transfer survived motion to dismiss).  "Whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action."  Fed. R. Civ. P. 18(b); *see also* Fed. R. Bankr. P. 7018 (applying said Federal Rule of Civil Procedure to adversary proceedings).  Thus, "[b]ecause it is possible that the Plaintiffs' [Section 550] claim

may become 'cognizable' after the fraudulent transfer claims are prosecuted to conclusion, the [Section 550] claim is legitimately joined with the Plaintiffs' other claims . . . and is not subject to dismissal for failure to state a claim." *See In re Com. Fin. Servs., Inc*., 322 B.R. 440, 452 (Bankr. N.D. Okla. 2003) (discussing disallowance of claims pursuant to Section 502(d)).

## CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' Motion.

Dated:  April 8, 2025
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Stephen Ehrenberg (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: ehrenbergs@sullcrom.com
        gluecksteinb@sullcrom.com
        decampj@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com

*Counsel for Plaintiff*